The D. H. Willey Lumber Company v. Commissioner. D. H. Willey v. Commissioner.
The D. H. v. Commissioner
Docket Nos. 10864, 11911, 11912 and 12597.
United States Tax Court
1948 Tax Ct. Memo LEXIS 150; 7 T.C.M. (CCH) 454; T.C.M. (RIA) 50299; June 29, 1948
*150 The D. H. Willey Lumber Company Issues Issues 1 and 9. (a) Certain understatements of sales, overstatements of purchases, omissions of income and deductions for rental, all of which were paid by the company to its stockholders, held to be distributions to the stockholders as such rather than the payment of rental under a so-called agreement with its principal stockholder, and are taxable to the stockholders of the company as dividends to the extent of the available earnings or profits and are not deductible by the company as rentals. (b) An amount paid by the company in 1936 to an individual for looking after the property of one of its stockholders, held, not deductible by the company under section 23 (a), Revenue Act of 1936. (c) An amount paid by the company in 1937 for a new automobile and charged to purchases, held, not deductible as a business expense. (d) Certain bonuses paid by the company to its employees, held deductible as not being in excess of reasonable compensation. (e) In 1941 petitioner Willey sold at par 50 shares of stock which he owned in the company to an employee of the company. Willey did not prove the cost basis of this stock. Held, he is taxable on the amount *151 determined by respondent for lack of evidence to show his cost basis, it being clear as to the amount which he received in the sale. (f) Upon the facts as found in paragraph 33 of the findings of fact, held, the company is entitled to deduct under section 23 (k) of the Revenue Act of 1936, $3,000 as a reasonable addition to its reserve for bad debts. (g) In its return for 1943 the company did not understate its gross sales. Issue 2. Certain expenditures held to be capital expenditures and not deductible by the company as business expenses. Issue 3. A certain amount paid by the company to its employees in 1941 as a Chistmas bonus but erroneously charged on its books to advertising, held deductible by the company under section 23 (a) (1) (A), I.R.C., as compensation paid. Issue 4. Where the respondent disallows a certain amount claimed by the company as a deduction for capital stock tax and no evidence is offered by the company in connection with the adjustment, held, the respondent's determination as to that adjustment is sustained. Issue 5. Held, although the company used bad methods of book-keeping as to some of the deductions which it sought to take and was guilty of gross negligence *152 in so doing, it is found that under all the facts in the record, the income and excess profits tax returns of the company for the years involved were not false and fraudulent with intent to evade tax and the fraud penalties determined by the Commissioner are not sustained. Mitchell v. Commissioner, 118 Fed. (2d) 308. Issue 6. The income and excess profits tax returns of the company for the years 1936 and 1937 were not false and fraudulent with intent to evade tax. The Commissioner has conceded that if the Court holds such to be the case deficiencies against the company for those years are barred by the statute of limitations. Held, that deficiencies determined against the company for the years 1936 and 1937 are barred by the statute of limitations. D. H. Willey Issues Issue 7. The respondent's determination as to this issue is sustained for lack of proof. Issue 8. Willey acquired certain properties in 1930 upon the liquidation of a corporation in which he was both the principal stockholder and creditor. He sold some of these properties during the years 1936 through 1941, but did not report the sales on his returns. Held, the respondent did not err in determining that Willey received *153 taxable income from such sales in the amount of $7,790.48. In 1943, Willey sold some more of the properties acquired in 1930 including timber and reported a net capital gain of $6,700.95. The respondent determined that the net capital gain was only $750 and that Willey realized ordinary gain of $4,689.50. Held, the respondent did not err in that determination. Issue 10. The respondent's determination that Willey failed to report an amount of interest received in 1943 is sustained for lack of proof to the contrary. Issue 11. Held, that although Willey was grossly negligent in the way he reported and failed to report some of the items of his gross income, it is found from all the facts that his income tax returns were not false and fraudulent with intent to evade tax and the fraud penalties determined by the Commissioner are not sustained. Mitchell v. Commissioner, 118 Fed. (2d) 308. L. F. Ratterman, C.P.A., 3529 Burch Ave., Cincinnati, Ohio, for the petitioners. John O. Durkan, Esq., for the respondent. BLACK Memorandum Findings of Fact and Opinion The respondent, in these consolidated proceedings, determined deficiencies in tax and 50 per cent penalties as follows: D. H. WILLEY LUMBER CO.
Declared
Docket
Excess
value
profits
excess
No.
Year
Income tax
Penalty
tax
Penalty
profits tax
Penalty
10864
1942
$1,282.50
$ 641.25
1943
991.24
495.62
$ 558.30
$ 279.15
11911
1936
4,583.85
2,291.93
$1,429.05
$ 714.53
1937
205.62
102.81
1938
3,527.75
1,763.88
2,515.07
1,257.54
1939
1,089.19
544.60
842.08
421.04
1940
2,086.59
1,043.30
1,663.27
831.64
1941
3,716.52
1,858.26
353.65
176.83
D. H. WILLEY
11912
1936
295.64
147.82
1937
920.65
460.33
1938
2,245.59
1,122.80
1939
959.10
479.55
1940
2,747.59
1,373.80
1941
3,298.46
1,649.23
12597
1943
2,665.68
*154 The deficiencies in tax are due to numerous adjustments to the net income as reported by petitioners in the returns. The adjustments are set out, together with explanations thereof, in statements attached to the respective deficiency notices. The adjustments which increase the net income as reported fall under the general label "Unallowable deductions and additional income" and those which decrease the net income as reported fall under the general label "Non-taxable income and additional deductions." In the first three docket numbers petitioners do not contest any of the adjustments which decrease the net income as reported. The D. H. Willey Lumber Co. in Dockets 10864 and 11911, by appropriate assignments of error, contests certain adjustments, summarized as follows: Adjustment
1936
1937
1938
1939
1940
(1) Sales
$11,395.97
$3,000.00
$15,000.00
(2) Purchases
4,307.55
1,047.69
9,567.34
$10,067.34
$10,998.89
(3) Discounts
1,292.45
(4) Recovery of bad
debts
604.03
(5) Other costs
519.60
1,283.04
(6) Office expense
200.00
(7) Capital expend-
itures
3,517.31
(8) Advertising
(9) Rent
(10) Real estate
taxes
(11) Capital stock
tax
Totals
$18,119.60
$5,330.73
$24,767.34
$10,067.34
$14,516.20
Adjustments
1941
1942
1942
(1) Sales
$ 259.09
(2) Purchases
$11,333.67
(3) Discounts
(4) Recovery of bad
debts
(5) Other costs
(6) Office expense
(7) Capital expend-
itures
367.20
(8) Advertising
165.00
(9) Rent
$4,733.73
4,733.73
(10) Real estate
413.42
taxes
(11) Capital stock
tax
237.50
Totals
$11,865.87
$5,384.65
$4,992.82
The *155 respondent in his brief concedes that he was in error in making adjustment (10). Effect will be given to that concession in the recomputation to be made under Rule 50. D. H. Willey in Dockets 11912 and 12597, by appropriate assignments of error, contests certain adjustments, summarized as follows (Note: Willey concedes a part of the dividends adjustment as indicated below; and the capital gain adjustment for 1943 is an adjustment which decreases the net income as reported): Capital
Other
Dividends
Sale of
Total
Year
gain
income
Conceded
Contested
Interest
timber
contested
1936
$ 990.00
$2,078.91
$ 62.00
$ 3,068.91
1937
1,266.02
133.11
$ 7,301.77
8,567.79
1938
1,104.87
184.35
15,232.88
16,337.75
1939
514.16
79.36
6,458.78
6,972.94
1940
2,676.51
54.78
8,094.58
10,771.09
1941
150.01
105.73
8,085.67
8,235.68
1942
3,810.67
3,810.67
1943
( 5,950.95)
4,118.36
$842.00
$4,689.50
3,698.91
($4,960.95)
$7,790.48
$619.33
$53,102.71
$842.00
$4,689.50
$61,463.74 The D. H. Willey Lumber Co. alleges that the assessment and collection of any deficiency in tax against it for the years 1936 and 1937 are barred by the statute of limitations. The respondent affirmatively alleges that the returns as filed by the D. H. Willey Lumber Co. for the years 1936 through *156 1943 and the returns as filed by D. H. Willey for the years 1936 through 1941 were false and fraudulent returns with intent to evade tax and that each of the deficiencies in tax for such years was due, in whole or in part, to fraud with intent to evade tax. Both D. H. Willey Lumber Co. and D. H. Willey deny respondent's affirmative allegations of fraud. D. H. Willey Lumber Company Issues The issues thus raised in Dockets 10864 and 11911 and not conceded by the respondent are summarized as follows: 1. Did the respondent err in determining that the returns as filed by the company for the taxable years 1936 through 1943 contained understatements of sales, omissions of discounts earned and bad debt recoveries, and overstatements of purchases and rent? 2. Did the respondent err by classifying as capital expenditures certain amounts claimed by the company in certain years from 1936 through 1941 as ordinary and necessary business expenses? (Embraced under this issue are the adjustments labeled "Other costs" for 1936 and 1937, "Purchases" for 1937, "Office expense" for 1938, $531.55 of "Purchases" for 1940, $150 of "Purchases" for 1941, and "Capital expenditures" for 1940 and 1941.) 3. Did *157 the respondent err in disallowing $165 deducted by the company in 1941 as advertising expense? 4. Did the respondent err in disallowing $237.50 deducted by the company on its 1942 return as capital stock tax? 5. Did the respondent err in asserting fraud penalties against the company for the taxable years 1936 through 1943? 6. Is the assessment or collection of any deficiency against the company for the years 1936 and 1937 barred by the statute of limitations? The respondent concedes that these years are barred unless fraud is proven. D. H. Willey Issues The issues raised in Dockets 11912 and 12597 may be summarized as follows: 7. Did the respondent err by adding to the taxable income of Willey for the year 1936 long term capital gain in the amount of $990 or is Willey entitled to a deductible loss of 30 per cent of $500? 8. Did the respondent err in determining that Willey derived taxable income from sales of property, including some timber, in 1936 through 1941 and in 1943? (Embraced under this issue are the adjustments labeled "Capital gain" for 1943, "Other income" for 1936 through 1941, and "Sale of timber" for 1943.) 9. Did the respondent err in determining that certain distributions *158 received by Willey from the D. H. Willey Lumber Co. in 1937 through 1943 constitute taxable dividends? 10. Did the respondent err by adding to the taxable income of Willey for the year 1943 interest in the amount of $842? 11. Did the respondent err in asserting fraud penalties against Willey for the taxable years 1936 through 1941? Findings of Fact D. H. Willey Lumber Company 1. The D. H. Willey Lumber Company (hereinafter sometimes referred to as "the Company") is an Ohio corporation which, during the taxable years 1936 through 1943, was doing business in Cincinnati, Ohio. It filed its returns with the collector for the first district of Ohio in Cincinnati. It was incorporated in January, 1924. 2. During the taxable years 1936 through 1943, D. H. Willey was president and L. F. Ratterman was vice president and secretary of the company. Willey also filed his individual returns with the collector for the first district of Ohio in Cincinnati. 3. The outstanding common stock of the company, par value $100, was owned as follows: D. H.
L. F.
Henry E.
Henry
Edward
Year
Willey
Ratterman
Betz
Geist
H. Geist
1936
780 sh.
55 sh.
15 sh.
1937
780
55
15
1938
855 [1] *159 130 [1]
15
1939
855
130
15
1940
855
130
15 [2]
1941
805
130
50 [3]
15
1942
805
130
50
15
1943
805
130
50
15
4. The income and declared value excess profits tax returns of the company for the taxable years 1936 through 1943 were prepared under the direction of Ratterman. He also kept the books of the company and all entries therein were either made by him or under his personal supervision. The books were kept upon the accrual basis. Ratterman is about 62 years of age, an attorney and certified public accountant duly licensed to practice in Ohio, a former member of the Ohio State Board of Accountancy and an officer of several corporations located in Cincinnati. 5. Ratterman and Willey have been business associates since 1924. As officers both signed the income and declared value excess profits tax returns filed by the company for the taxable years 1936 through 1943. 6. The sales of the company for the taxable years 1936 as shown by the books of account totalled $138,032.48, while the income and declared value excess profits tax return filed by the company for that year reported only $126,636.51 or *160 an understatement of $11,395.97. 7. The books of the company show total purchases of $88,352.01 for the taxable year 1936 while the income and declared value excess profits tax return filed by the company for that year reported $92,059.56 or an overstatement of $3,707.55. Included in the amount of $88,352.01 was $600 charged to purchases on November 24, 1936. The $600 was paid to P. M. Karr for looking after some property in Alabama which was owned by Willey. The charge to purchases was improper. The effect of this improper charge is that the total purchases reported on the return of the company were overstated in the amount of $4,307.55. 8. The books of the company show discounts earned of $1,292.45 for the taxable year 1936, while the income and declared value excess profits tax return filed by the company for that year failed to include this amount in income. 9. The books of the company show bad debt recoveries of $604.03 for the taxable year 1936, while the income and declared value excess profits tax return filed by the company for that year failed to include this amount in income. 10. The company erroneously understated its income in the amount of $17,000 as described in paragraphs *161 6 to 9, inclusive, supra, by charging its profit and loss account in the general ledger with that amount, the credit being to accounts payable. The charge to profit and loss was described as "Big Springs." In this manner the net income as shown by the Company's profit and loss statement agreed with that reported on its tax returns. 11. In the taxable year 1937 the erroneous credit of $17,000 to accounts payable referred to in paragraph 10, supra, was eliminated by distributions to stockholders of the company in proportion to their holdings of stock as follows: Number of shares
Distributions
Amount received
held in the Co.
received
per share held
D. H. Willey
780
$15,600
$20
L. F. Ratterman
55
1,100
20
Henry Geist
15
300
20
Total
850
$17,000 12. On October 31, 1938, $4,533.67 was charged to purchases of lumber from the Big Springs Lumber Co. in the accounts payable journal of the company, the credit being to accounts payable. This entry did not represent an actual purchase of lumber. On November 30, 1938, the company drew a check for $4,533.67 to Fred Ratterman, care of Big Springs Lumber Co. This check was charged to accounts payable. Fred, in accordance with the directions of his father L. F. Ratterman, *162 distributed this amount pro rata to the stockholders of the company as follows: Shares
Amount
Amount
held
received
per share
D. H. Willey
780
$4,160.32
$5.33374
L. F. Ratterman
55
293.35
5.33374
Henry Geist
15
80.00
5.33374
850
$4,533.67
13. During November, 1938, $3,967.33 was charged to purchases of lumber from the Big Springs Lumber Co. and credited to accounts payable on the Company's books. On December 21, 1938, similar entry for $566.34 was made. Neither of these entries represented actual purchase of lumber. On December 31, 1938, a check for $4,533.67 was issued by the company to Fred Ratterman, care of Big Springs Lumber Co. Fred distributed this amount to the stockholders of the company on the basis of the stockholdings prior to the receipt by Willey and Ratterman of the 150 shares of treasury stock mentioned in paragraph 3, supra, as follows: Shares
Amount
Amount
held
received
per share
D. H. Willey
780
$4,160.32
$5.33374
L. F. Ratterman
55
293.35
5.33374
Henry Geist
15
80.00
5.33374
850
$4,533.67
14. Sales by the company of lumber, building materials and millwork for October, 1938 were understated in posting from the journal to the ledger by the respective amounts of $1,000, $1,000 and $3,000 or a total understatement *163 of sales of $5,000. Likewise the ledger postings for these accounts for the following months of November and December of 1938 were also understated. The total understatement of sales for these three months was $15,000. For each of these months a credit of $5,000 was entered in an account titled "Commissions due officers." This was an erroneous account for neither officer of the company was entitled to commissions. The total credit of $15,000 thus entered to this account balanced the understatement of sales for the same period. In 1930 purchases by the company of its stock in the total amount of $15,000 were entered in its treasury stock account. Both the "Commissions due officers" and "Treasury stock" accounts are still open on the books of the company and each carries the $15,000 balance resulting from the entries described above. The income tax return of the company for 1938 included $15,000 of treasury stock as an asset in the balance sheet at the beginning of the taxable year but nothing for treasury stock in the balance sheet (Schedule M) at the end of the taxable year. On December 20, 1938, the company transferred without consideration half of its $15,000 worth of treasury stock *164 to Ratterman and half to Willey. The net effect of these entries was to set up an erroneous liability to the officers of the company at the expense of sales and to satisfy that alleged liability by issuing treasury stock worth $15,000. 15. On July 29, 1939, $2,266.83 was charged to purchases of lumber from the Big Springs Lumber Co. and credited to accounts payable on the books of the company. On August 29, 1939, $2,466.84 was charged to mill purchases and credited to accounts payable on the books of the company. Neither of these amounts represented actual purchases. On July 29 and September 30, 1939, the company issued checks to Fred Ratterman as trustee of the Big Springs Lumber Co. in the respective amounts of $2,266.83 and $2,466.84. Fred distributed this total amount of $4,733.67 pro rata to the stockholders of the company as follows: Shares
Amount
Amount
held
received
per share
D. H. Willey
855
$4,047.29
$4.73367
L. F. Ratterman
130
615.38
4.73367
Henry Geist
15
71.00
4.73367
1,000
$4,733.67
16. During October, 1939, $4,333.67 was charged to purchases of lumber from the Big Springs Lumber Co. and credited to accounts payable on the books of the company. This entry did not represent an actual purchase *165 of lumber. On October 28, 1939, the company issued a check to Fred Ratterman as trustee of the Big Springs Lumber Co. in the amount of $4,333.67. This was charged to accounts payable. Fred distributed this amount of $4,333.67 pro rata to the stockholders of the company as follows: Shares
Amount
Amount
held
received
per share
D. H. Willey
855
$3,705.29
$4.33367
L. F. Ratterman
130
563.38
4.33367
Henry Geist
15
65.00
4.33367
1,000
$4,333.67
17. On July 12, 1940, $2,366.83 and $2,366.84 were charged to purchases of lumber and millwork, respectively, from the Big Springs Lumber Co. on the books of the company. The credit in each instance was to accounts payable. Neither of these entries represented actual purchases. On July 12, 1940, the company issued a check to Fred Ratterman as trustee of the Big Springs Lumber Co. in the amount of $4,733.67. Fred then distributed this $4,733.67 pro rata to the stockholders of the company as follows: Shares
Amount
Amount
held
received
per share
D. H. Willey
855
$4,047.29
$4.73367
L. F. Ratterman
130
615.38
4.73367
Edward H. Geist
15
71.00
4.73367
1,000
$4,733.67
18. Fred Ratterman was a member of the law firm of Ratterman, Cowell and Fletcher. He never was a trustee for the Big Springs Lumber *166 Co., never performed any services for that company and the foregoing distribution by him to the stockholders of the D. H. Willey Lumber Co. were made as his father, L. F. Ratterman, directed. 19. On November 9 and 22, 1940, $2,766.83 and $1,966.84 were charged to purchases of lumber and millwork, respectively, from the Big Springs Lumber Co. and credited to accounts payable on the books of the company. Neither of these entries represented actual purchases. On November 23 and December 4, 1940, checks for $2,766.83 and $1,966.84, respectively, were issued by the company to Stuart E. Fletcher, as attorney for the Big Springs Lumber Co. and charged to accounts payable. On December 18, 1940, Fletcher distributed the $4,733.67 so received pro rata to the stockholders of the company as follows: Shares
Amount
Amount
held
received
per share
D. H. Willey
855
$4,047.29
$4.73367
L. F. Ratterman
130
615.38
4.73367
Edward H. Geist
15
71.00
4.73367
1,000
$4,733.67
20. On December 30, 1941, $4,733.67 was charged to purchases of lumber from the Big Springs Lumber Co. and credited to accounts payable on the books of the company. This did not represent an actual purchase. On December 30, 1941, the company issued a check *167 in the amount of $4,733.67 to Fletcher as attorney for the Big Springs Lumber Co. Fletcher then distributed the amount so received to the stockholders of the company pro rata as follows: Shares
Amount
Amount
held
received
per share
D. H. Willey
805
$3,810.60
$4.73367
L. F. Ratterman
130
615.38
4.73367
Edward H. Geist
15
71.01
4.73367
Henry E. Betz
50
236.68
4.73367
1,000
$4,733.67 21. Fletcher was a member of the law firm of Ratterman, Cowell and Fletcher. He never was an attorney for the Big Springs Lumber Co. and made the foregoing distributions to the stockholders of the D. H. Willey Lumber Co. at the request of Ratterman. 22. On December 29, 1942, $4,733.73 was charged to purchases of lumber from the Big Springs Lumber Co. and credited to accounts payable on the books of the company. This entry did not represent an actual purchase of lumber. On its return the company deducted this amount as "Rent." On December 29, 1942, a check for $4,733.73 was issued by the company to Ratterman and charged to accounts payable. Ratterman deposited this check and caused cashier's checks to be drawn pro rata to the stockholders of the company. He retained the undistributed balance of the $4,733.73. The amounts so distributed *168 and retained were as follows: Shares
Amount
Amount
held
received
per share
D. H. Willey
805
$3,810.67
$4.73373
L. F. Ratterman (retained)
130
615.37
4.73373
Henry E. Betz
50
236.68
4.73373
Edward H. Geist
15
71.01
4.73373
1,000
$4,733.73
23. On December 28, 1943, $4,733.73 was charged to purchases of lumber from the Big Springs Lumber Co. and credited to accounts payable on the books of the company. This entry did not represent an actual purchase of lumber and should not be confused with the eight cars that were purchased from Willey in 1943, which purchases are mentioned in paragraph 32 below. On its return the company deducted this amount as "Rent." On December 28, 1943, the company issued Ratterman a check for $4,733.73 which was charged to accounts payable. This check was deposited by Ratterman who caused a cashier's check to be issued to Willey in the amount of $4,118.36, the remaining amount of $615.37 being retained by Ratterman. The amounts so distributed and retained are as follows: Shares
Amount
Amount
held
received
per share
D. H. Willey
805
$4,118.36
$4.73373 - (Included
share of Betz and
Edward H. Geist
who were not paid.)
L. F. Ratterman (retained)
130
615.37
4.73373
$4.733.73
24. Ratterman and Willey received *169 but did not report as taxable income the following distribution of cash and treasury stock from the company (above described in paragraphs 6 through 23): Henry
Edward
Year
Willey
Ratterman
Geist
H. Geist
Betz
Total
1937
$15,600.00
$ 1,100.00
$300
$17,000.00
1938
15,820.64
8,086.70
160
24,067.34
1939
7,752.58
1,178.76
136
9,067.34
1940
8,094.58
1,230.76
$142.00
9,467.34
1941
3,810.60
615.38
71.01
$236.68
4,733.67
1942
3,810.67
615.37
71.01
236.68
4,733.73
1943
4,118.36
615.37
4,733.73
$59,007.43
$13,442.34
$596
$284.02
$473.36
$73,803.15 25. The Big Springs Lumber Co. of Alabama was incorporated on April 11, 1924, and liquidated and ceased to do business on or about November 30, 1930. Willey and Ratterman were president and secretary, respectively, of that company. The capital stock ledger account of the Big Springs Lumber Co. showed the outstanding stock from the date of incorporation to dissolution to have been held as follows: D. H. Willey
(715 shares at 100)
$71,500
D. J. Wilkinson
( 75 shares at 100)
7,500
E. E. Wilkinson
( 1 share at 100)
100
L. F. Ratterman
( 5 shares at 100)
500
26. At some time prior to the liquidation of the Big Springs Lumber Co., Willey transferred to Ratterman without consideration 145 shares of his holdings in the *170 Big Springs Lumber Co. This transfer was not shown on the capital stock ledger account of the Big Springs Lumber Co. Ratterman kept the books and prepared all the income tax returns of the Big Springs Lumber Co. during its entire existence. 27. At the date of its dissolution the records of the Big Springs Lumber Co. disclosed a liability on notes payable to Willey in the amount of $57,500 less $12,163.26 charged to Willey on the books of the company, or a net indebtedness to Willey of $45,336.74. 28. On November 7, 1930, the Big Springs Lumber Co. deeded by a general warranty deed all of its assets to Willey, as an individual. These assets consisted of approximately 3,500 acres of land in Clarke County, Alabama, also all the timber, timber contracts, rights of way, and all rights, privileges and easements owned by the Big Springs Lumber Co. incident to any such timber or to any of the fee simple lands described in the deed, and also the saw mill plant and equipment, all steel rails, "and all other property, whether real or personal, of every kind and character, belonging to said Big Springs Lumber Company." Among other things, the deed which was received in evidence as petitioners' *171 Exhibit 5 recited that: "This conveyance is made pursuant to a resolution duly and regularly adopted by the Board of Directors of said Big Springs Lumber Company, with the consent of the holders of more than 75% of the capital stock of the Company, as authorized by Article 7 of the by-laws of said corporation, which Article 7 is as follows, to-wit: "The assets of this Company may be disposed of as an entirety by the Board of Directors, only on consent of the holders of not less than 75% of the capital stock of the Company." The deed was signed by Willey as president and attested to by Ratterman as secretary. The deed was filed for record on December 3, 1930 and was recorded in Deed Book 236, pages 322 and 323 in the office of the Judge of the Probate Court at Grove Hill, Clarke County, Alabama. The assets of the Big Springs Lumber Co. thus transferred to Willey on November 7, 1930, were recorded on the books of the Big Springs Lumber Co. at a cost of $16,425.27. The record does not show what their fair market value was at that time. There is no evidence on that point. 29. Sometime during December, 1930, after the deed (Exhibit 5) was recorded, Willey and the company entered into an *172 agreement which was received in evidence as petitioners' Exhibit 6, and is in full as follows: "Whereas, The Big Springs Lumber Company, of Clarke County, Alabama, is to be liquidated, and is indebted to D. H. Willey, of Cincinnati, Ohio in the sum of $57,500.00, on promissory notes for money advanced; and, "Whereas, D. H. Willey owns $57,500.00, and L. F. Ratterman $15,000.00, par value, of the Capital Stock of said corporation, being fully paid for, and said corporation owns assets on its books for $16,425.27, which are being transferred to D. H. Willey for said notes, less $12,163.26 already charged to him on the books of the Company; "Now therefore, in consideration of D. H. Willey holding the timber now growing, and which will grow, during the period of the next fifteen years, for the future use of The D. H. Willey Lumber Company, of Cincinnati, Ohio, the said The D. H. Willey Lumber Company agrees to pay the par value of the stock of the Big Springs Lumber Company held by D. H. Willey and L. F. Ratterman, and to pay D. H. Willey to the further extent of $28,911.47, if he does not realize more than $16,425.27 upon the assets transferred to him by The Big Springs Lumber Company, *173 and if so then to the extent of $28,911.47 reduced by the amount realized in excess of said $16,425.27. "The D. H. Willey Lumber Company is to have the advantage of the natural growth and development of the timber, in consideration for which it agrees to pay the foregoing amounts, in such future years when it may operate at a profit, by paying such amounts as it is possible to pay, as a rental for the said property and timber, to be deducted from its sales, or included in its costs, to be paid to D. H. Willey and L. F. Ratterman to reduce the amounts due to them from The Big Springs Lumber Company, as aforesaid. "With the growth and development of the timber, when in the future the said timber may be cut and manufactured into lumber, D. H. Willey agrees that all lumber purchased by The D. H. Willey Lumber Company shall be on a basis of a stumpage cost of Four Dollars, ($4.00), less per thousand feet board measure than whatever the current stumpage price may be at the time. "It is agreed that there is no fixed rental to be paid, and if The D. H. Willey Lumber Company does not pay said amounts it shall forfeit any and all rights because of partial payments, and no rights are to attach *174 to the said timber, and property upon which it stand, after December 31st, 1945. "December , 1930. "THE D. H. WILLEY LUMBER COMPANY, "/S/ L. F. Ratterman, V.P. "/S/ D. H. Willey" 30. Karr (mentioned in paragraph 7 above) managed the property that Willey acquired from the Big Springs Lumber Co. upon its liquidation in 1930. Parts of this property consisting of approximately one half were sold from time to time. During the years 1936 through 1941, Willey personally received from such sales the following amounts which he did not report as income: Amount
Year
received
1936
$2,078.91
1937
1,266.02
1939
514.16
1940
2,676.51
1941
150.01
Total
$7,790.48
In the statement attached to the deficiency notice in Docket 11912 the adjustment of "Other income" for 1936 is explained as follows: "(d) It is held that during the taxable year, you received as a result of sales of timber and other assets from property owned by you in Clarke County, Alabama, other income of $2,078.91. As this income was not included on your tax returns, your gross income for the year ended December 31, 1936 has been increased by this amount in accordance with the provisions of section 22(a) of the Revenue Act of 1936." Indentical explanations, *175 except for the amount involved and the citation of the applicable statute, were made by the respondent for each of the other adjustments of "Other income" for the years 1937 through 1941. During 1941 Willey also received $600 from the sale of a part of the property acquired from the Big Springs Lumber Co. which he did not report. The respondent determined that the net income as disclosed by Willey's return for 1941 should be increased by "(c) Long-term capital gain $300" which adjustment he explained as follows: "(c) It is held that during the taxable year, you realized a net long-term capital gain to be taken into account in the amount of $300.00. "Computation
Gross sales price
(taxpayer's
50% share)
Basis
Gain
Percentage
Amount
120 acres of land, Clarke
County, Alabama
$600.00
0
$600.00
50%
$300.00" In his petition Willey did not contest this adjustment. On his return for 1943, Willey reported $6,700.95 as a net gain from the sale or exchange of capital assets. In Schedule B attached to the return, he arrived at this net gain as follows: 1. Kind of property
Real Estate and Timber
Timber
2. Date acquired
1930
1930
3. Date sold
1943
1943
4. Gross sales price
$1,500.00
$12,901.90
5. Cost or other basis
$1,000.00
Zero
6. Expenses of sale
None
None
7. Depreciation allowed
None
None
8. Gain
$500
$12,901.90
9. Percentage to be taken into account
50%
50%
10. Gain to be taken into account ( $250
plus $6,450.95 equals
$6,700.95)
$250
$6,450.95
*176 As to the "Real Estate and Timber" the respondent determined that the basis was zero; that there was a gain of $1,500; and that 50 per cent of that gain should be taken into account as a long term capital gain. As to the "Timber" the respondent determined that only $4,689.50 of the $12,901.90 was taxable in 1943 on the ground that $8,212.40 was not received until 1944, a year that is not before us. The respondent did not disturb the basis "Zero" reported by Willey but determined that 100 per cent of the determined gain of $4,689.50 must be taken into account. In a statement attached to the deficiency notice in Docket 12597 the respondent made and explained adjustments to "Income Tax Net Income" and "Victory Tax Net Income" for 1943 as follows: "Adjustments to Income Tax Net Income - Year
Ended December 31, 1943
Income tax net income disclosed by return
$17,200.22
Unallowable deductions and additional income: (a) Dividends
$4,118.36
(b) Interest
842.00
(c) Sale of Timber
4,689.50
9,649.86
Total
$26,850.08
Nontaxable income and additional deductions: (d) Capital gain
5,950.95
Income tax net income adjusted
$20,899.13
"Explanation of Adjustments to Income Tax Net Income "(a) Your income from dividends *177 is held to be $8,483.36, in lieu of $4,365.00 as reported. Accordingly, your gross income has been increased $4,118.36, in accordance with the provisions of section 22(a) of the Internal Revenue Code. "(b) Your income from interest is determined to be $2,986.25, in lieu of $2,144.25 as reported, in accordance with the provisions of section 22(a) of the Internal Revenue Code. "(c) It is determined that you realized income of $4,689.50 from the sale of timber. It is held that this amount is not subject to the percentage provisions of section 117(b) of the Internal Revenue Code; and that the entire amount is includible in gross income under the provisions of section 22(a) of the Internal Revenue Code. "(d) It is determined that you realized a net long-term capital gain of $750.00, in lieu of $6,700.95 as reported. "Computation
To be taken
"Property
Basis
Sales price
Gain
into account
Real estate and timber
0
$1,500.00
$1,500.00
$750.00
"Due to the lack of proper substantiation, the basis of the real estate and timber in the above computation is regarded as zero. "The gain of $12,901.90, from the sale of timber, also included in Schedule B of your return, has been decreased to $4,689.50, and is *178 held not to be the result of the sale of a capital asset as outlined hereinbefore. "Adjustments to Victory Tax Net Income
Year Ended December 31, 1943
Victory tax net income disclosed by return
$11,709.25
Unallowable deductions and additional income: (a) Dividends
$4,118.36
(b) Interest
842.00
(c) Sale of timber
4,689.50
9,649.86
Total
$21,359.11
Nontaxable income and additional deductions: (d) Taxes
308.73
Victory tax net income adjusted
$21,050.38 "Explanation of Adjustments to Victory Tax Net Income "(a) Your income from dividends has been increased $4,118.36, as explained hereinbefore. "(b) Your income from interest has been increased $842.00, as explained hereinbefore. "(c) It is determined that, from the sale of timber, you realized income of $4,689.50, which is properly includible in victory tax net income in accordance with the provisions of section 451(a) of the Internal Revenue Code . "(d) Taxes in the amount of $308.73 are held to be deductible from victory tax net income in accordance with the provisions of section 451(a) of the Internal Revenue Code." 31. The company did not purchase any lumber from Willey during the years 1936 through 1942. In 1943 it purchased eight cars of lumber *179 from Willey which came from the timber he had acquired from the Big Springs Lumber Co. upon the liquidation of that company in 1930. In payment for such purchases the company paid the regular O.P.A. prices and did not take advantage of the provision in Exhibit 6 "that all lumber purchased by The D. H. Willey Lumber Company shall be on a basis of a stumpage cost of Four Dollars, ($4.00), less per thousand feet board measure than whatever the current stumpage price may be at the time." 32. During 1936 the company paid $519.60 for a new truck and deducted that amount as an expense. The respondent disallowed the deduction and held that the expenditure should be capitalized and returned through deductions for depreciation. 33. The respondent determined that the net sales of the company for 1937 were understated in the amount of $3,000. The company in its petition alleges that the socalled understatement of sales was in effect a deduction for bad debts. In its return for 1937 the company did not take any deduction for bad debts, as such. Schedule A of the return for 1637 is the net income computation. Under the heading "Gross Income" of Schedule A are Items 1 through 14 and under the heading *180 "Deductions" are Items 15 through 31. Item 19 is captioned "Bad debts (from Schedule H)." Schedule H is an elaborate schedule requiring considerable information if a taxpayer seeks deduction for bad debts. The company left both Item 19 and Schedule H blank. Under Item 1 of Schedule A the company reported the following: Gross sales
$181,318.13
Less returns and allowances
4,399.13
Net sales
$176,919.00
The respondent determined that the net sales of the company for 1937 were $179,919 instead of $176,919, which in effect was a disallowance of $3,000 of the $4,399.13 deducted by the company as "returns and allowances." This $3,000 included in "returns and allowances" was intended by the company to represent a deduction for bad debts. The sales journal kept by the company for October, November and December of 1937 showed sales of lumber for these months of $4,983.03, $5,783.10 and $3,697.09, respectively. Of these amounts only $3,983.03, $4,783.10 and $2,697.09, respectively, were posted to the general ledger sales account. Ratterman made these postings. He intended these short postings to represent a deduction of $3,000 from sales on account of certain bad debts as explained below. Henry E. *181 Betz has been with the company for about 24 years. During the taxable years in question he supervised the bookkeeping under Ratterman's direction but he is not an accountant. He is not familiar with the two standard ways of charging off bad debts. The company maintained a loose-leaf accounts receivable ledger. Whenever an account was regarded as bad, Betz caused it to be removed from the current accounts receivable ledger and to be placed in a bad accounts receivable ledger. This was the only method of handling bad debts with which Betz was familiar. The company has taken no deductions for bad debts, as such, for any of the years from 1936 through 1943. During these years it carried on its books a reserve for bad debts as follows: Reserve for bad
debts as of:
Amount
December 31, 1935
$20,216.51
December 31, 1936
151.39
December 31, 1937
151.39
December 31, 1938
76.34
December 31, 1939
76.34
December 31, 1940
76.34
December 31, 1941
76.34
December 31, 1942
76.34
December 31, 1943
76.34 On or about the time the return for 1937 was filed the company removed eight accounts from its current accounts receivable ledger and placed them in the bad accounts receivable ledger. It then referred them to a collection *182 association and to one or more attorneys for collection. On each of these accounts, except one, appears a penciled notation "Charged off 12-1937" together with an amount with a circle drawn around the notation. The name of each of these accounts, the debit balance in the account on December 31, 1937, the amount shown in the penciled notation as being "Charged off 12-1937" and the total amount actually collected from such debts in the four following years, are as follows: Debit balance
Amount shown as
Amount collected
Name of account
December 31, 1937
charged off
in next four years
Edward Runck
$ 150.15
$ 150.15
$ 39.65
William M. Gay
90.59
90.59
None
E. B. Doss
535.29
520.29
30.00
Flicker Inn
337.75
337.75
112.75
John P. Lott
1,216.39
None
75.00
John L. Thompson
192.61
192.61
5.00
John Pangello
347.23
347.23
None
Wm. A. Brandenberg
238.77
238.77
184.81
Totals
$3,108.78
$1,877.39
$447.21
The $30 that was collected from Doss was paid $15 on April 14, 1938 and $15 on August 22, 1938. This would seem to indicate that the penciled notation of "$520.29 Charged off 12-1937" was made after the first payment of $15 but before the second payment. The reason for deducting $3,000 as a part of the "returns and allowances" instead of opposite *183 Item 19, was that as a general rule the debtors claimed as a reason for not paying their accounts that they had returned some of the material purchased and were entitled to certain allowances which the company had not granted. For the year 1937 the company is entitled to deduct under section 23 (k) of the Revenue Act of 1936, $3,000 as a reasonable addition to its reserve for bad debts. 34. During 1937 the company paid $1,047.69 and $1,283.04 for new automobiles and deducted the amounts paid as expenses. The respondent disallowed the deductions and held that the expenditures should be capitalized and returned through deductions for depreciation. 35. During 1938 the company paid $200 for a secondhand adding machine and deducted that amount as an expense. The respondent disallowed the deduction and held that the expenditure should be capitalized and returned through deductions for depreciation. 36. During the years 1938, 1939 and 1940, Betz had one or two employees under his supervision. In 1941 he had five under office supervision and an additional 10 to 15 under the entire plant. He became general manager and treasurer of the company in 1941. During these years he did most of the buying *184 for the company and looked after all of the selling. In 1941 he put in a lot of overtime work. As compensation the company paid him the following amounts: Regular
Bonus
Turkey
Year
Salary
Checks
Bonus
Total
1938
$2,080
$ 500
$2,580
1939
2,080
1,000
3,080
1940
2,080
1,000
$10
3,090
1941
2,600
6,000
8,600
The respondent allowed the company as deductions from gross income the amounts paid Betz as regular salary and the turkey bonus, but he has not allowed any deduction for the bonus checks. These latter amounts totaling $8,500, although paid to Betz as bonuses, were not deducted by the company as such, but were charged to purchases and disallowed by the respondent as representing a part of the amounts determined by the respondent as overstatement of purchases for these years of $9,567.34, $10,067.34, $10,998.89 and $11,333,67, respectively. Of the total of $6,000 paid in 1941, the amount of $5,000 was paid under the following circumstances. Prior to receipt of the $5,000 Betz had agreed to pay it over to Willey in return for 50 shares of the capital of the company. Certificate No. 27 for 50 shares of capital stock of the company was issued to Betz on December 4, 1941, signed by Ratterman and Willey as secretary *185 and president of the company. On December 11, 1941, a check for $5,000 was issued by the company to Betz who endorsed it to Willey. Willey, in turn, made a gift of $650 to Ratterman and a gift to Edward Geist of $75 and kept $4,275 for himself. On its excess profits tax return for 1941 the company reported "Money paid in for stock, or as paid-in surplus, or as a contribution to capital $100,000.00." The gross sales reported by the company on its returns for the years 1938 through 1941, were as follows: 1938
$189,358.85
1939
187,144.27
1940
209,150.47
1941
314,618.44
There was no arrangement or authorization made by or on behalf of the company to pay Betz any fixed amount based upon sales made during those years. Willey was paid an annual salary during these years of $9,000. He usually went to Florida from two to three months in the winter and left Betz in charge. Originally Betz considered the bonuses paid to him to be gifts and did not report them as income until he was informed otherwise by certain revenue agents at which time he filed amended returns. The total amounts paid Betz as compensation for the years 1938 through 1941 consisting of his regular salary and bonuses, constituted reasonable *186 allowances for salaries or other compensation for personal services actually rendered to the company by Betz during those years and represent deductible expenses. 37. On December 20, 1941, the company paid bonuses to certain of its employees as follows: Ed. Geist
$250
John Beckel
100
William Pope
50
Elmer Probst
50
Total
$450
The president of the company determined these amounts from the worthiness of the employees. The total amount so paid was not deducted by the company as compensation paid employees, but was charged to purchases and disallowed by the respondent as representing a part of $11,333.67 determined by the respondent as overstatement of purchases for the year 1941. The bonuses so paid are deductible as not being in excess of reasonable compensation. 38. On December 24, 1941, Betz, as treasurer of the Co., signed check No. 2173 for $165 payable to the order of the Second National Bank of Cincinnati. This check was used to pay a Christmas bonus of $10 to each of 13 employees of the Co. and $5 to each of seven employees of the Co. The total amount of $165 so paid was deducted by the Co. on its return as advertising and was disallowed by the respondent in his determination of the deficiency *187 against the Co. for the year 1941. The total amount so paid to 20 employees was paid for services rendered to the Co. and when added to other compensation paid to such employees did not exceed a reasonable compensation paid for services rendered. 39. No evidence has been offered to show error on the part of the respondent relative to $531.55 of the $10,998.89 purchases adjustment for 1940, the $3,517.31 capital expenditures adjustment for 1940, $150 of the $11,333.67 purchases adjustment for 1941, the $367.20 capital expenditures adjustment for 1941, and the $237.50 capital stock tax adjustment for 1942, all of which are summarized in our opening statement. 40. For the year 1943, the respondent determined that the Company had understated its gross sales for that year in the amount of $259.09. The respondent based this determination upon an office copy of an invoice of goods sold to Charles Springmyer on May 27, 1943. This invoice was originally made out for three items of lumber totaling $802.37, plus a sales tax of $24.08, total $826.45. This amount was posted to sales, billed to the customer and is not here in question. At the bottom of the invoice there was a listing of six items *188 of lumber totaling 5,352 feet B.M., at $47 average, $251.54, plus a sales tax of $7.55, total $259.09. This amount was not posted to sales, was not billed to the customer and was not a sale of lumber by petitioner. The Company did not understate its gross sales for 1943 by the amount of $259.09. 41. In a statement attached to the deficiency notice in Docket 11912, the respondent increased the net income reported by Willey on his return for 1936 by adjustment "(c) Capital gain $990.00" and explained the adjustment as follows: "(c) It is determined that, during the taxable year, you realized a net long-term capital gain to be taken into account in the amount of $990.00. Accordingly, your gross income has been increased by this amount in accordance with the provisions of sections 22 (a) and 117 of the Revenue Act of 1936. Selling
Selling
Price
Expense
Computation
Unimproved real
Cost or
Taken into account
estate, Evans
Other Basis
Profit
Percentage
Amount
Street
$4,000
$200
$500
$3,300
30%
$990"
Willey sold this property in 1936 for $4,000. He had received the property about 1918 as his interest in the settlement of an old company. 42. Willey in answer to Question 5 on his 1942 return stated that he had *189 received $4,118.36 (see paragraph 24 above) during the taxable year which he claimed to be nontaxable. He reported this amount as being "Liquidation payment. Capital repaid." Willey answered "Yes" to Question 6 on his 1943 return which question is "6. Did you receive during your taxable year any amount claimed to be nontaxable (see General Instruction I)? If so, attach schedule showing source, nature, and amount of such income." Willey merely answered "Yes" in the blank space and typed at the end of the question the words "capital payment" and did not report the amount claimed to be nontaxable. Questions similar to Questions 5 and 6 on the 1942 and 1943 returns, respectively, did not appear on the returns for 1936 through 1940. Question 7 on the 1941 return was similar to the above-mentioned Questions 5 and 6. Willey in answer to Question 7 on his 1941 return said "No." Except for the year 1942, the amounts received by Willey, as stated in paragraph 24 above, were not disclosed by Willey on his income tax returns. Neither did Willey report in his 1941 return the sale by him of 50 shares of stock of the Company to Betz for a consideration of $5,000 as stated in paragraph 37 above. 43. *190 The net income of the Co. for the years 1936 through 1943 as determined by the respondent in his deficiency notices and prior to any adjustments which may or may not be necessary as a result of this report is as follows: Net income as
determined by
Year
the respondent
1936
$21,283.75
1937
8,873.09
1938
30,333.93
1939
17,604.44
1940
23,951.28
1941
30,358.38
1942
20,764.07
1943
21,034.79
The respondent determined that certain amounts received by the Co. from the Home Federal Savings and Loan Association and included by the Co. in interest income on certain of its returns were nontaxable as follows: Year
Amount
1939
$107.75
1940
125.00
1941
125.00
The Co. paid regularly declared dividends to its stockholders during the years here in question as follows: Year
Amount
1936
None
1937
None
1938
None
1939
$5,000
1940
5,000
1941
5,000
1942
5,000
1943
5,000
The balance sheets of the Co. which are a part of the returns filed for the years in question reported either a deficit or a surplus, as of December 31, as follows: As of December 31
Surplus
Deficit
1935
$16,404.31
1936
12,601.85
1937
8,759.68
1938
2,510.86
1939
$ 572.29
1940
4,279.35
1941
16,620.77
1942
23,437.89
1943
25,714.98 44. For each of the years 1936, 1937, 1938, 1939, 1940, 1941, 1942 and 1943, *191 petitioner, The D. H. Willey Lumber Company's income and excess profits tax returns were not false or fraudulent with intent to evade tax and the statute of limitations has barred the deficiencies and penalties for the years 1936 and 1937. 45. For each of the years 1936, 1937, 1938, 1939, 1940 and 1941, petitioner D. H. Willey's income tax returns were not false or fraudulent with intent to evade tax. The Commissioner did not determine fraud for the taxable year 1943 against Willey. Opinion BLACK, Judge: The issues presented in these proceedings are in the main questions of fact. Having made a long, detailed findings of fact little more than a summation thereof is necessary in this opinion. We will endeavor, however, to discuss as briefly as possible the issues previously stated in substantially their regular order. Issues 1 and 9. (a) We have found that the sales of the Co. for 1936 and 1938 were definitely understated in the amounts of $11,395.97 and $15,000, respectively. Petitioner's justification for these understatements is Exhibit 6 set out in full in paragraph 29 of our findings of fact. We have also found that the overstatements of purchases, as determined by the respondent, *192 consisted of charges to purchases made by the Co. as follows: Par. of
facts
Nature of charge
1936
1937
1938
1939
1940
7
Exhibit 6
$3,707.55
7
Paid to Karr
600.00
35
New Automobile
$1,047.69
12
Exhibit 6
$4,533.67
13
Exhibit 6
4,533.67
37
Bonus to Betz
500.00
15
Exhibit 6
$ 4,733.67
16
Exhibit 6
4,333.67
37
Bonus to Betz
1,000.00
17
Exhibit 6
$ 4,733.67
19
Exhibit 6
4,733.67
37
Bonus to Betz
1,000.00
40
Capital item
531.55
40
Capital item
20
Exhibit 6
37
Bonus to Betz
38
Bonuses to
employees
40
Capital item
Totals
$4,307.55
$1,047.69
$9,567.34
$10,067.34
$10,998.89
Par. of
facts
Nature of charge
1941
7
Exhibit 6
7
Paid to Karr
35
New Automobile
12
Exhibit 6
13
Exhibit 6
37
Bonus to Betz
15
Exhibit 6
16
Exhibit 6
37
Bonus to Betz
17
Exhibit 6
19
Exhibit 6
37
Bonusto Betz
40
Capital item
20
Exhibit 6
$4,733.67
37
Bonus to Betz
6,000.00
38
Bonuses to employees
450.00
40
Capital item
150.00
Totals
$11,333.67
We have also found that for 1936, the Co. failed to report as income discounts in the amount of $1,292.45 and bad debts recovered in the amount of $604.03. We have also found (paragraphs 22 and 23) that for each of the years 1942 and 1943, the Co. deducted $4,733.73 as rent, when in fact it paid no rent. Its justification for these omissions of income and deductions of rent is Exhibit 6. *193 The sum of Exhibit 6 items for each of the taxable years involved is as follows: Item
1936
1938
1939
1940
1941
1942
Sales
understated
$11,395.97
$15,000.00
Purchases
overstated
3,707.55
9,067.34
$9,067.34
$9,467.34
$4,733.67
Income
omitted
1,896.48
Rent
deducted
$4,733.73
Totals
$17,000.00
$24,067.34
$9,067.34
$9,467.34
$4,733.67
$4,733.73
Item
1943
Sales
understated
Purchases
overstated
Income omitted
Rent deducted
$4,733.73
Totals
$4,733.73 1258
The totals in the above schedule were distributed and paid to the stockholders of the Co. during the years and in the amounts stated in paragraph 24 of our findings. These distributions were all made in exact proportion to the stock owned in the Co. with the one exception of the understatement of sales for 1938 in the amount of $15,000. As stated in paragraph 14 of our findings Willey and Ratterman each received $7,500 worth of treasury stock of the Co. for this $15,000 of understatement of sales. Stockholders Willey and Ratterman did not report any of these distributions to them as taxable income. The theory upon which the Co. and these two stockholders attempt to justify the above understatement of sales, overstatement of purchases, omissions of income and deductions for rent *194 on the part of the Co. in the total amount of $73,803.15 and the failure on the part of these two stockholders to report any part of such amount as taxable income is this: Willey and Ratterman claim that they had invested a total of $129,500 in the capital stock and advances to the Big Springs Lumber Co. of Alabama which company was liquidated in 1930. At the time of the liquidation all of the assets of the Alabama company were transferred to Willey (see paragraph 28). After this was done the agreement referred to herein as Exhibit 6 was signed by Ratterman as vice-president of the Co. and by Willey individually. The paragraph of this agreement most particularly relied upon by petitioners is the following: "The D. H. Willey Lumber Company is to have the advantage of the natural growth and development of the timber, in consideration for which it agrees to pay the foregoing amounts, in such future years when it may operate at a profit, by paying such amounts as it is possible to pay, as a rental for the said property and timber, to be deducted from its sales, or included in its costs, to be paid to D. H. Willey and L. F. Ratterman to reduce the amount due to them from The Big Springs *195 Lumber Company, as aforesaid." The Co. contends, therefore, that the total of $73,803.15 was paid by it as "rental" and that the amount applicable to each year is deductible as an ordinary and necessary business expense under section 23 (a) of the Revenue Acts of 1936 and 1938 and of the Internal Revenue Code, whereas Willey and Ratterman [1] contend that they are entitled to have their investment in the Alabama company returned to them tax free before they are taxable on any amount paid to them by the D. H. Willey Lumber Co. Both contentions, we think, are without merit. The last paragraph of Exhibit 6 provides: "It is agreed that there is no fixed rental to be paid, and if The D. H. Willey Lumber Company does not pay said amounts it shall forfeit any and all rights because of partial payments, and no rights are to attach to the said timber, and property upon which it stands, after December 31st, 1945." Under this so-called agreement the Co. was not actually obligated to make any payments. It could have permitted the *196 entire 15 years from 1930 to 1945 to pass without making any payments and without incurring any liability on its part. Furthermore, the so-called agreement was between it and Willey who was the sole owner of the property of the Alabama company after the latter was liquidated, and there was no reason for these payments to be made to the stockholders of the Co. in proportion to their stockholdings in the Co. We agree with the respondent that the payments totaling $73,803.15 were in substance nothing more than a distribution of profits of the Co. to its stockholders. As such they are not deductible by the Co. as ordinary and necessary business expenses. It does not follow, however, that the entire amounts received by the stockholders of the Co. are taxable to them as dividends. That depends upon how much earnings of the Co. were available for distribution. Of the amounts received by Willey and Ratterman as set out in paragraph 24 of our findings, the respondent determined, under section 115 of the Revenue Acts of 1936, 1938, and of the Internal Revenue Code, that the amounts taxable to Willey and Ratterman as dividends were as follows: Percentage
Year
Willey
Ratterman
taxable
1937
$ 7,301.77
$ 514.87
46.806%
1938
15,232.88
7,498.94
95.116%
1939
6,458.78
982.04
83.311%
1940
8,094.58
1,230.76
100%
1941
[2] *197 8,085.67
[3] 1,254.53
100%
1942
3,810.67
615.37
100%
1943
4,118.36
615.37
100%
Petitioners Willey (and Ratterman in his separate proceedings) contend that in addition to the previously mentioned contention that they are entitled to have their investment in the Alabama company returned to them tax free before they are taxable on any amount paid to them by the D. H. Willey Lumber Co., that the latter Co. had deficits during certain of the taxable years and that under Ohio law it would be precluded from paying any dividends as long as the deficits continued. The fact that the Co. may have had deficits during certain years is not material. Section 22 (a) of the Revenue Acts of 1936, 1938 and of the Internal Revenue Code includes "dividends" in gross income. Section 115 (a) of the same statutes defines the term "dividend" as "any distribution made by a corporation to its shareholders *198 * * * out of the earnings or profits of the taxable year" and section 115 (b) of the same statutes provides that "every distribution is made out of earnings or profits to the extent thereof, and from the most recently accumulated earnings or profits." The respondent in arriving at the percentage taxable took into consideration the net income of the Co. as adjusted by him, the non-taxable income, the tax liability of the Co. as shown in the deficiency notices, any unallowable deductions of the Co., and any other distributions paid by the Co. in addition to the amounts paid under Exhibit 6. This was proper, but since some of these factors will be changed as a result of this report it will be necessary for the parties to recompute under Rule 50 the percentage taxable to Willey of the amounts set out in paragraph 24 of our findings, and we so hold. (b) The amount $600of paid by the Co. to Karr in 1936 for looking after some property in Alabama belonging to Willey is not deductible by the Co. as an ordinary and necessary expense under section 23 (a) of the Revenue Act of 1936. The Co. does not contend that the amount is deductible as additional compensation to Willey. Neither does the *199 respondent contend that the amount is in any way taxable to Willey. We leave this item as the respondent has determined it. (c) The amount of $1,047.69 paid by the Co. in 1937 for a new automobile is a capital expenditure and is not deductible as an expense of the Co. The respondent so determined and allowed the Co. a deduction for depreciation of the automobile This was proper. (d) and (e) During the years 1938 through 1941, the Co. paid bonuses to Betz of $500, $1,000, $1,000 and $6,000, respectively, as set out in paragraph 36 of our findings. Betz was a valuable employee of the Co. and in 1941 he became general manager and treasurer of the Co. and put in a considerable amount of overtime work for the Co. He was paid a small salary during all of these years. We have found as an ultimate fact that the total amounts paid Betz as compensation during the years 1938 through 1941 constituted reasonable allowances paid for compensation for personal services actually rendered the Co. by Betz during those years. We hold that the total amounts so paid are deductible by the Co. under section 23 (a) of the Revenue Act of 1938 and of the Internal Revenue Code. The respondent did not allow the *200 Co. to deduct any part of the bonuses (except the turkey bonus of $10) and determined that $5,000 of the $6,000 paid to Betz in 1941 was not a bonus to Betz but was a distribution of profits by the corporation to its stockholders. The evidence is clear that $6,000 was paid to Betz as a bonus and that Betz used $5,000 of this bonus to pay for 50 shares of stock of the Co. which he had agreed to buy from Willey. Willey then made outright gifts to Ratterman and Geist of $650 and $75, respectively. It happens that these gifts were made on the basis of stockholdings of the three men prior to the transfer of the 50 shares from Willey to Betz, as follows: Shares
Amount
Amount
held
received
per share
D. H. Willey (retained)
855
$4,275
$5
L. F. Ratterman
130
650
5
Edward Geist
15
75
5
1,000
$5,000 We hold that the above amounts were not distributions of profits as the respondent has determined (see footnotes 2 and 3). We further hold that Willey received $5,000 from Betz as consideration for the sale by Willey to Betz of 50 shares of stock of the Co. at par. Of course it goes without saying that this sale of stock by Willey to Betz was a taxable transaction. The profit was the sale price less the cost of the *201 shares to Willey. Willey has offered no evidence showing the cost to him of these shares. We, therefore, affirm the Commissioner in adding $4,275 in the taxable year 1941 to Willey's taxable income, by reason of this transaction, though not as dividends, because of the reasons already stated. Included in the $11,333.67 determined by the respondent as an overstatement of purchases for 1941 is the amount of $450 which the company paid to four of its employees as bonuses. Section 23 (a)(1)(A), I.R.C., allows as deductions from gross income "All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including a reasonable allowance for salaries or other compensation for personal services actually rendered." We hold that this $450 is deductible by the company under this provision of the Code. (f) We will consider next the respondent's determination that the net sales of the company for 1937 were understated in the amount of $3,000. The facts concerning this item are set forth in considerable detail at paragraph 34 of our findings. The applicable provision of the Revenue Act of 1936 is in the margin. [4] The respondent in his brief *202 requests us to find that the company uses the "direct charge-off method of deducting bad debts." He cites as his authority for this request the following testimony given by Ratterman in response to the following question asked by the respondent's counsel: "Q. What method of charging off bad debts was employed by the D. H. Willey Lumber Company? "A. We have to use the direct chargeoff method. We have to because the Government requires that." Ratterman was no doubt mistaken in his testimony for the record shows that during all of the years here in question the company carried on its books a reserve for bad debts. As a matter of fact it could hardly be said that the company employed specifically either the direct *203 charge-off method or the reserve method of charging off bad debts. We think it came nearer to the reserve method than to the direct charge-off method. Cf. Morris Plan Industrial Bank of New York v. Commissioner, 151 Fed. (2d) 976, 982. Otherwise, it would not have carried on its books a reserve for bad debts. Its reserve for bad debts as of December 31, 1936 and as of December 31, 1937 was $151.39. We hold upon all of the facts that $3,000 is a reasonable addition to the reserve for 1937 and that the company is entitled to deduct this amount from its gross income for that year. (g) The last item under Issue 1 concerns the respondent's determination that the company understated its sales for 1943 in the amount of $259.09. This is a fact question which we have found in favor of the company in paragraph 41 of our findings. Issue 2. This issue overlaps Issue 1 to the extent of "Purchases" for 1937 in the amount of $1,047.69, $531.55 of "Purchases" for 1940, and $150 of "Purchases" for 1941. The item of $1,047.69 (new automobile) has been decided against the company and no evidence was offered as to the two items of $531.55 and $150. See paragraph 40 of our findings. This leaves for *204 consideration the adjustments "Other costs" for 1936 and 1937, "Office expense" for 1938, and "Capital expenditures" for 1940 and 1941. Our findings as to these adjustments are at paragraphs 33, 35, 36 and 40. On the basis of these findings we sustain the respondent's determinations as to this issue. Issue 3. The facts as to this issue are found in paragraph 39 of our findings. The fact that the company charged this amount of $165 paid by it to 20 of its employees to advertising and claimed it as such on its 1941 return does not preclude it from now claiming that the amount is deductible as representing a "reasonable allowance for salaries or other compensation for personal services actually rendered" under section 23 (a) (1) (A) of the Internal Revenue Code. We hold that the amount is so deductible. Issue 4. Since no evidence was offered as to this issue (see paragraph 40 of our findings), the respondent's determination is sustained. Issue 5. The question here is whether the respondent erred in asserting fraud penalties against the company for the taxable years 1936 through 1943. The applicable statutory provisions are section 293 (b) of the Revenue Acts of 1936 and 1938 and of *205 the Internal Revenue Code. Since all of these provisions are substantially the same we will set out in the margin only the provisions of the Code. [5] "Fraud is a fact to be proven by clear and convincing evidence." Charles E. Mitchell, 32 B.T.A. 1093, 1128; affirmed, 303 U.S. 391. The burden of proving fraud is upon the Commissioner. Section 601, Revenue Act of 1928 (applicable for the taxable years here involved of 1936, 1937 and 1938); and section 1112, I.R.C. (applicable for the years 1939 through 1943). We do not think the Commissioner has sustained his burden of proving fraud. Certainly the Commissioner has proved that petitioner D. H. Willey Lumber Company used some very bad bookkeeping methods and had a very confused and imperfect understanding of legal methods. The most glaring of these was its understatement of sales and *206 overstatement of purchases to equal amounts which petitioner claims were due Willey and Ratterman under the agreement of 1930 (Exhibit 6). If this agreement of 1930 had been proven a sham and a fictitious instrument devised to cloak a distribution of profits under the guise of capital payments, we would not hesitate to hold the company guilty of fraud. However, it seems to us that the authenticity of the agreement is well proved by the evidence. We think the evidence shows that it was executed at the time and under the circumstances which petitioners claim. As we have already ruled, it is our view that this socalled agreement does not legally accomplish what the company and the other parties claim for it. It does not convert what were in effect dividends to capital payments. Nevertheless we are reasonably convinced by the evidence that the company, Willey, and Ratterman all thought they had in the execution of the agreement, devised a plan by which Willey and Ratterman could recoup their losses in the Big Springs Lumber Company and the Willey Lumber Co. could secure a deduction of the payments made, as so-called rentals. The evidence is to the effect that Willey and Ratterman took *207 no losses in their income tax returns on their investments in the stock of the Big Springs Lumber Company, when it was liquidated in 1930 and the main reason why they did not, was because of the execution of this written agreement, Exhibit No. 6 which was executed soon after the liquidation took place. It is true, as we have already pointed out in our findings of fact and opinion, this liquidation of the Alabama company was complete in 1930 and whatever losses Willey and Ratterman incurred by reason of such liquidation should have been taken then and there and they could not recoup them in the manner which they sought to devise. We would not be willing, however, under all the facts and circumstances which we have in this record, to hold that they were guilty of fraud because of these attempts. As we have already pointed out, we think the company was very careless and negligent in its methods of bookkeeping and these methods are not at all to be commended but on the contrary are to be condemned and their use would, no doubt, support a negligence penalty but negligence, however great, is not sufficient to support fraud penalties. In Mitchell v. Commissioner, 118 Fed. (2d) 308, reversing *208 40 B.T.A. 424, the court held that "fraud" within the statute providing for unlimited period for assessment in case of false or fraudulent returns and the statute providing for penalty of 50 per cent additional because of "fraud" in tax return with intent to evade the tax means actual intentional wrong doing, and the intent required is the specific purpose to evade a tax believed to be owing, and mere negligence, whether slight or great, is not equivalent to fraud. This opinion of the Circuit Court was followed by us in a supplemental opinion in William E. Mitchell, 45 B.T.A. 822. Therefore on the facts which we have endeavored to set out fully in our findings of fact and without unnecessarily prolonging this discussion we hold that petitioner, The D. H. Willey Lumber Company's returns for the taxable years here involved were not false and fraudulent with intent to evade tax and the 50 per cent fraud penalties determined by the Commissioner are not sustained. Issue 6. Section 276 (a) of the Revenue Act of 1936 provides: "(a) False Return or No Return. - In the case of a false or fraudulent return with intent to evade tax or of a failure to file a return the tax may be assessed, *209 or a proceeding in court for the collection of such tax may be begun without assessment, at any time." In view of our holding, under Issue 5, and in view of the respondent's concession referred to in our opening statement, it follows that the assessment or collection of any deficiencies against the company for the years 1936 and 1937 are barred by the statute of limitations. D. H. Willey Issue 7. The only facts proven as to this issue are set out in paragraph 42 of our findings of fact. It is obvious from these findings that Willey has failed to prove any error on the part of the respondent as to this issue. Issue 8. This issue (see paragraph 31 of our findings of fact) concerns the sales by Willey during the years 1936 through 1943 (except 1942) of a part of the property acquired by Willey from the Big Springs Lumber Co. on November 7, 1930, as set out in paragraph 28 of our findings of fact. At that time (see paragraph 27) the Big Springs Lumber Co. was indebted to Willey for advances he had made of $57,500 less $12,163.26 charged to him, or a net indebtedness of $45,336.74. The assets were transferred to Willey by deed on November 7, 1930 in part payment for this net indebtedness *210 of $45,336.74. The assets thus transferred to Willey were recorded on the books of the Big Springs Lumber Co. at a cost of $16,425.27, but their fair market value at that time has not been shown. No effort was made to show what that was. The fair market value of these assets on November 7, 1930, would constitute Willey's cost basis of such assets for future transactions. The liquidation of the Big Springs Lumber Co. was a transaction upon which gain or loss was realized by the stockholders and creditors of that company, but since Willey has failed to prove what this fair market value was, we must sustain the respondent's determination of a "zero" basis. Even if we were to find that the fair market value of all the assets acquired by Willey from the Big Springs Lumber Co. on November 7, 1930, was their cost to the Big Springs Lumber Co. of $16,425.27 it would be of no help to him for the reason that it would be impossible on the present state of the record to allocate that cost to the assets sold and to the assets retained. Cf. Carrie Lutcher Brown, 26 B.T.A. 781, affirmed 69 Fed. (2d) 863. Willey did not report any of the $7,790.48 received by him during the years 1936 through 1941. *211 His contention as to these amounts is that he is entitled to recoup his investment in the stock of and advances to the Big Springs Lumber Co. by way of sales of property and receipt of payments from the D. H. Willey Lumber Co. (Issue 9) before realizing any income. For the reasons already given we do not agree with this contention, and, upon the present state of the record we must sustain the respondent's determination as to the total amount of $7,790.48 received by Willey during the years 1936 through 1941. Willey's contentions as to 1943 are somewhat different. Although on his return for 1943 he claimed a basis of $1,000 on the reported sale of "real estate and timber" of $1,500 and no basis on the reported sale of "timber" for $12,901.90, he now concedes that on the sales made in 1943 he is entitled to no basis. On his return he claimed the advantages of section 117 (b) of the Internal Revenue Code as amended by sections 150 (c) and 101 of the Revenue Act of 1942 and reported only 50 per cent of the reported gains of $500 and $12,901.90, respectively. As to the sale of "real estate and timber" the respondent disallowed the basis claimed; determined the entire $1,500 as gain; but *212 took into account only 50 per cent of the gain. Willey does not contest the respondent's determination as to this item, and we, therefore, sustain it. As to the sale of "timber"the respondent determined that only $4,689.50 of the $12,901.90 was received in 1943; that this entire amount of $4,689.50 was includible in gross income under section 22 (a) of the Internal Revenue Code; and that Willey was not entitled to the advantages of section 117 (b), supra. Willey's only objection to this determination is his contention that only 50 per cent of the gain of $4,689.50 should be taken into account. He argues that to deny this contention would be inconsistent with the respondent's determination as to the sale of "real estate and timber" for $1,500, inasmuch as all the property sold was acquired at the same time, namely, in 1930 from the Big Springs Lumber Co. The applicable provisions of the Internal Revenue Code, as amended, are in the margin. [6] *214 *215 See also Senate Report No. 627, Seventy-eighth Congress, First Session, 1944 C.B. 993, entitled "Timber Relief" in connection with section 127 of the Revenue Act of 1943, which section amended section 117 of the Internal Revenue Code. It is obvious *213 from a reading of the applicable provisions of the Code, as amended, that there are many factors to be taken into consideration in deciding whether a taxpayer who sells timber is entitled to the benefit of the capital gains provisions of the law. Cf. Estate of M. M. Stark, 45 B.T.A. 882; Camp Manufacturing Company, 3 T.C. 467, 473; Isaac S. Peebles, Jr., 5 T.C. 14; and Three States Lumber Co. v. Commissioner, 158 Fed. (2d) 61. The only factors proven in the instant proceedings are those set out in paragraph 31, supra. We are unable to determine from the factors set out in paragraph 31 whether or not the respondent erred as to this item of $4,689.50. It does not necessarily follow that the holding as to this item must be the same as it was in connection with the sale of "real estate and timber" for $1,500. The factors as to each item may be entirely different. We, therefore, sustain the respondent's determination as to this issue. Issue 10. As shown in the statement attached to the deficiency notice in Docket 12597 and set out as a part of paragraph 31 of our findings, the respondent increased Willey's income by an adjustment for interest in the amount of $852. Willey assigned this as error but has offered no evidence to that effect. The respondent's determination as to this issue is sustained. Issue 11. We decide this issue for petitioner. The Commissioner in his determination of the deficiencies and penalties against Willey, determined that Willey's returns for all the taxable years in issue except the year 1943 were false and fraudulent with intent to evade tax. In our findings of fact on this issue we found that these returns were not false and fraudulent with intent to evade tax. The reasons for this finding are much the same as those which we have already stated more at length in the case of D. H. Willey Lumber Co. *216 We do not think it is necessary to repeat them here. It would unnecessarily prolong the length of this opinion. We adopt that reasoning as in the main applicable here. The petition of Willey does not raise the issue of the statute of limitations as in the Willey Lumber Co. case and therefore there is no basis for holding that any of the deficiencies determined against Willey are barred by the statute of limitations. Decisions will be entered under Rule 50. Footnotes
1. Includes 75 shares of the Company treasury stock each received on December 20, 1938. 2. Henry Geist died and his 15 shares went to his nephew, Edward H. Geist, in 1940. ↩
3. Purchased from D. H. Willey in 1941.↩
1. The Ratterman proceedings consisting of Docket Nos. 11319, 11913 and 12080 will be considered in a separate report, because they involve other issues not here involved.↩
2. This amount consists of the $3,810.60 received by Willey from the Co., $4,275 of the $5,000 received from Betz in payment for 50 shares of stock of the Co., and of an error on the part of the respondent of 7 cents. 3. This amount consists of the $615.38 received by Ratterman from the Co., plus a $650 gift from Willey, and minus excessive dividends from other sources reported by Ratterman of $10.85.↩
4. SEC. 23. DEDUCTIONS FROM GROSS INCOME. In computing net income there shall be allowed as deductions: * * *
(k) Bad debts. - Debts ascertained to be worthless and charged off within the taxable year (or, in the discretion of the Commissioner, a reasonable addition to a reserve for bad debts); and when satisfied that a debt is recoverable only in part, the Commissioner may allow such debt, in an amount not in excess of the part charged off within the taxable year, as a deduction.↩
5. SEC. 293. ADDITIONS TO THE TAX IN CASE OF DEFICIENCY. * * *
(b) Fraud. - If any part of any deficiency is due to fraud with intent to evade tax, then 50 per centum of the total amount of the deficiency (in addition to such deficiency) shall be so assessed, collected, and paid, in lieu of the 50 per centum addition to the tax provided in section 3612(d)(2).↩
6. SEC. 117. CAPITAL GAINS AND LOSSES. (a) Definitions. - As used in this chapter - (1) Capital Assets. - The term "capital assets" means property held by the taxpayer (whether or not connected with his trade or business), but does not include * * * property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business, or * * * real property used in the trade or business of the taxpayer; * * *
(b) Percentage Taken Into Account. - In the case of a taxpayer, other than a corporation, only the following percentages of the gain or loss recognized upon the sale or exchange of a capital asset shall be taken into account in computing net capital gain, net capital loss, and net income: 100 per centum if the capital asset has been held for not more than 6 months; 50 per centum if the capital asset has been held for more than 6 months. * * *
(j) Gains and Losses from Involuntary Conversion and from the Sale or Exchange of Certain Property Used in the Trade or Business. - (1) Definition of Property Used in the Trade or Business. - For the purposes of this subsection, the term "property used in the trade or business" means * * * Such term also includes timber with respect to which subsection (1) or (2) is applicable. * * *
(k) Gain or Loss Upon the Cutting of Timber. - * * *
(2) In the case of the disposal of timber (held for more than six months prior to such disposal) by the owner thereof under any form or type of contract by virtue of which the owner retains an economic interest in such timber the difference between the amount received for such timber and the adjusted depletion basis thereof shall be considered as though it were a gain or loss, as the case may be, upon the sale of such timber.