*Decision will be entered under Rule 50.*

ESTATE OF M. M. STARK, DECEASED, H. J. LUTCHER STARK, EXECUTOR, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

ESTATE OF W. H. STARK, DECEASED, H. J. LUTCHER STARK, EXECUTOR, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 103807, 103808. Promulgated December 5, 1941.

*Irl F. Kennerly, Esq.*, for the petitioners.

*Frank B. Schlosser, Esq.*, and *H. G. Potthoff, Esq.*, for the respondent.

OPINION.

SMITH: These proceedings, consolidated for hearing, are for the redetermination of deficiencies in income tax of the estate of Miriam M. Stark, H. J. Lutcher Stark, Executor, Docket No. 103807, and

estate of W. H. Stark, H. J. Lutcher Stark, Executor, Docket No. 103808, for the calendar years 1936, 1937, and 1938 as follows:

| Year | Deficiency | |
|---|---|---|
| | Docket No. 103807 | Docket No. 103808 |
| 1936 | $2,840.52 | $513.84 |
| 1937 | 12,584.64 | 117.72 |
| 1938 | 5,256.37 | 2,579.19 |

The decedents were husband and wife and the transactions out of which the present tax dispute arose relate, for the most part, to their community properties. The petitions contain fourteen allegations of error, all but one of which are common to both proceedings. Several of the issues have been waived and others have been settled by stipulations entered into by counsel at the hearing, leaving for our determination the following four questions:

(1) Were the profits which the petitioners derived in 1937 and 1938 from the sale of timber under the contract entered into in 1917 capital gains, as petitioners contend, or ordinary income, as the respondent has determined?

(2) Are the petitioners entitled in 1937 and 1938 to the deduction of the losses resulting from the operation of a leasehold previously acquired by the decedents where in decedents' estate tax returns a deduction was taken and allowed for the estimated amount of such operating losses over the remaining period of the leasehold?

(3) In the alternative, if petitioners are not entitled to the deduction of the entire amount of such operating losses, are they entitled in any event to a deduction of the difference between the amount of the actual losses and an aliquot part of the amount of the anticipated losses allowed in the estate tax returns spread ratably over the remaining life of the leasehold?

(4) Are the petitioners entitled to the deduction in 1937 of a fee paid to an attorney for services performed in an attempt to relieve the decedents' estates from certain obligations under the leasehold contract referred to in issues (2) and (3) above?

The findings of fact and opinion under each issue will be set out separately.

### ISSUE I.

### Timber Transaction.

FINDINGS OF FACT.—The petitioners are the estates in process of administration of W. H. Stark, who died October 8, 1936, and his wife, Miriam M. Stark, who died November 27, 1936. Both decedents were

residents of Orange County, Texas. Decedents' son, H. J. Lutcher Stark, is the executor of both estates. The income tax returns of both estates for the years 1936, 1937, and 1938 were filed with the collector at Austin, Texas.

Prior to October 12, 1912, the decedent, W. H. Stark, in association with his father-in-law, H. J. Lutcher, and his brother-in-law, E. W. Brown, acquired an interest in a large tract of timber land, comprising more than 80,000 acres, situated in Newton, Jasper, and Sabine Counties, Texas. The decedent, W. H. Stark, and E. W. Brown each acquired a one-sixth interest and H. J. Lutcher a two-thirds interest. Each of such interests was held as community property under the laws of the State of Texas. H. J. Lutcher died on October 12, 1912, and upon his death his one-half community interest in the two-thirds interest held by himself and wife passed to his daughters, Miriam M. Stark and Carrie L. Brown. Thereafter, and until February 12, 1917, the decedent, Miriam M. Stark, owned a one-sixth interest in the timber tract in her separate right and a one-sixth interest in community with her husband, W. H. Stark. Frances A. Lutcher, H. J. Lutcher's widow, owned a one-third interest, and the remaining one-third interest was owned one-sixth by Carrie L. Brown in her own right and one-sixth by her and her husband, E. W. Brown, in community.

On February 12, 1917, these persons entered into a contract with R. W. Wier covering all of the merchantable timber of certain specifications on the entire tract. Under the terms of this contract Wier, hereinafter sometimes referred to as the purchaser, acquired the exclusive right to enter upon the tract with all necessary equipment and to "turpentine" and cut and remove all the merchantable pine timber 10 inches or more in diameter at the stump. The contract provided in paragraph "3" that:

Party of the second part [R. W. Wier] hereby obligates and binds himself to pay to the parties of the first part for said timber the sum of $6.00 per thousand feet, log scale; and the further sum of Twenty-five per cent (25%) of the average selling price f. o. b. the mill, during each full semi-annual period, over and above the sum of $13.50 per thousand feet. Said payment of $6.00 per thousand feet to be made monthly, on or before the 15th day of each month, for the timber cut the preceding month, and the twenty-five per cent herein provided for shall be determined and estimated at the end of each six months period of operations, and shall be paid on or before the 15th day of succeeding months thereafter. * * *

It was further provided in the contract that the owners of the timber lands, sometimes referred to hereinafter as the sellers, were to have free access at all times to the books of the purchaser; that the timber, with certain exceptions, would be "scaled at the mill" at the joint expense of the purchaser and the sellers; that the purchaser

would build and equip on lands belonging to the sellers or adjacent thereto a modern sawmill with a capacity sufficient to cut 4,000,000 feet of timber yearly and all dry kilns, sheds, tramroads, railroads, and other facilities necessary for handling the timber; and that the purchaser would cut not less than 4,000,000 or more than 75,000,000 feet of timber annually, except that if market conditions should become such that the lumber would have to be sold at a loss to the purchaser, operations might be suspended temporarily. It was further provided that:

During the continuance of this contract, party of the second part shall maintain its [his] own sales department and sell its [his] product only through such sales department, or in such other way as may be hereafter. agreed upon by the unanimous consent of all directors, and in the event second party should desire at any time to sell his product in quantities or manner unusual to the customary conduct of industries of this type and at a price not satisfactory to the parties of the first part, then the parties of the first part shall have the right to purchase said offering, in preference to all other persons at such bona fide price.

It was further provided that the purchaser would immediately organize a corporation to construct the sawmill and operate the business and would assign his interest in the contract to such corporation. The corporation was to have a capital stock of $400,000, which was to be subscribed for at par and the subscription price paid in as needed by the purchaser, or by other stockholders whom he might procure. All of the net profits of the corporation were to be paid out as dividends to the stockholders until such net earnings equaled the total cost of the fixed investment and thereupon the stock was to be recalled and reissued, fully paid and nonassessable, one-half to the old stockholders in proportion to their former holdings and one-half to the sellers in the following proportion:

1/3 to Mrs. Frances A. Lutcher
1/6 to W. H. Stark
1/6 to Miriam M. Stark
1/6 to E. W. Brown
1/6 to Carrie L. Brown

Voting control and management of the corporation were to remain in the purchaser and his associates and for that purpose one share of stock was to be transferred in trust by the sellers to the purchaser or his nominee. The purchaser was to be president of the corporation and H. J. Lutcher Stark and E. W. Brown were to be among its seven directors.

Pursuant to the terms of the above described contract, the Wier Long Leaf Lumber Co. was incorporated under the laws of the State of Texas on January 10, 1917, and on that date Wier transferred to

it all of his rights to and interest in the contract. Thereafter the corporation began operations and has since continued to cut and remove a certain quantity of timber each year, for which it has paid the sellers regularly at the contract prices.

It is stipulated that the fair market value of the contract timber on October 8, 1936, and on November 27, 1936, the respective dates of death of W. H. Stark and Miriam M. Stark, was $7.18 per 1,000 feet.

It is stipulated further that during 1937 and 1938 the petitioners received from the Wier Long Leaf Lumber Co. certain payments for timber cut and removed from which their profits after the deduction of depletion and expenses, were as follows:

|  | 1937 | 1938 |
|---|---|---|
| Miriam M. Stark | $21,803.93 | $18,337.20 |
| Estate of W. H. Stark, deceased | 7,267.97 | 6,112.40 |

The petitioners kept their books and records and made their income tax returns for the years involved on the cash receipts and disbursements basis. In such returns they each reported the sales of timber from which the above stated amounts of profits were realized as gains from the sale of capital assets, within the meaning of section 117 of the Revenue Acts of 1936 and 1938. The respondent has determined in his deficiency notices herein that the amounts in question constituted ordinary income.

Likewise, in their returns for the tax year ended December 31, 1936, the estate of Miriam M. Stark and the estate of W. H. Stark claimed capital loss deductions on the sale of timber under the above contract in the respective amounts of $277.61 and $163.74. In lieu of such capital deductions, however, the respondent allowed the petitioners ordinary loss deductions in the respective amounts of $1,693.08 and $1,516.75.

OPINION.—The respondent's position is that the profits which petitioners received in 1937 and 1938 from the sale of timber under the contract of February 12, 1917, were ordinary income and not capital gains as reported in petitioners' returns.

Capital gains are defined in section 117 of the Revenue Act of 1936 as gains from the sale of capital assets, and "capital assets" are defined as follows:

(b) DEFINITION OF CAPITAL ASSETS.—For the purposes of this title "capital assets" means property held by the taxpayer (whether or not connected with his trade or business), but does not include stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business.

More specifically, the respondent contends that the petitioners were engaged in the trade or business of selling timber during the taxable years involved and that the profits in dispute were realized from the sale of "property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business", within the meaning of the above quoted provision of the statute. Obviously, the timber was a capital asset within the definition of the statute unless the petitioners were engaged in the trade or business of selling their timber during the taxable years involved.

One of the cases strongly relied upon by the respondent is *Commissioner* v. *Boeing* (C. C. A., 9th Cir.), 106 Fed. (2d) 305, which, respondent submits, is indistinguishable on the facts from the instant proceedings. In that case the taxpayer, along with other coowners of certain timber lands, entered into contracts employing logging companies to cut the timber, deliver it to tidewater, and there sell it *for and on behalf of the owners* to purchasers at the current market price. The taxpayer and his coowners were to receive one-third of the proceeds from the sales and the logging companies the other two-thirds. The court held, reversing the Board, that the taxpayer was engaged in a trade or business, citing *Richards* v. *Commissioner* (C. C. A., 9th Cir.), 81 Fed. (2d) 369, and *Welch* v. *Solomon* (C. C. A., 9th Cir.), 99 Fed. (2d) 41, and that the contracts were not "contracts of sale" and did not result in sales of timber to the logging companies, citing *John W. Blodgett*, 13 B. T. A. 1388, which, the court commented, "serves a useful purpose in distinguishing the instant case." (See other cases at 23 A. F. T. R. 355.)

In the *Blodgett* case, *supra*, the taxpayer contracted for the sale of the standing timber which the vendees were to cut and pay for on the basis of a certain percentage of the selling price. We held that the contract was a contract of sale of the standing timber and did not constitute the vendees agents of the taxpayer "so that, through them, he was engaged in lumbering operations." Thus it appears that the facts in the instant proceedings are indistinguishable from those in the *Blodgett* case rather than from those in the *Boeing* case. Here the contract was for the sale of all of the timber, of certain specifications, at so much per thousand feet, log scale, plus a further amount contingent on the sale price of the timber, plus further consideration with which we are not here concerned. The vendees themselves were to cut and market the timber and were to pay the vendors monthly for the amount cut. The vendees were in no sense agents of the vendors. The contract was a contract of sale of all the timber, as in the *Blodgett* case.

This identical contract of February 12, 1917, was under consideration by the Board in *Carrie Lutcher Brown*, 26 B. T. A. 781. The

question there in issue is not present in the instant proceedings, but with reference to this contract we said at page 787:

\* \* \* In the present proceeding there was no outright, completed sale of the entire stand of timber. Rather, the parties entered into a contract to sell such amounts of timber as the second party should cut and remove from the land. *Florence A. Foster*, 18 B. T. A. 819; *Edward G. Swartz, Inc.*, 25 B. T. A. 1065; *Carter* v. *Clark & Boice Lumber Co.*, 149 S. W. 278; *Houston Oil Co.* v. *Boykin*, 206 S. W. 815. \* \* \*

On appeal the Board was affirmed by the United States Circuit Court of Appeals for the Fifth Circuit, *Brown* v. *Commissioner*, 69 Fed. (2d) 863, the court there saying:

\* \* \* We are of the opinion that the timber was not sold as a whole, that a sale of none of it occurred upon the execution of the contract, but that sales were accomplished only as the timber was cut and removed. *Foster* v. *Commissioner* (C. C. A.) 57 F. (2d) 516; *Houston Oil Co.* v. *Boykin, supra*. \* \* \*

See also *J. J. Carroll*, 27 B. T. A. 65; affirmed on pertinent issue (C. C. A., 5th Cir.), 70 Fed. (2d) 806.

We think it plain in this case that the standing timber on the lands of the two petitioners was not "held" by them "primarily for sale to customers in the ordinary course of" their "trade or business" within the intendment of section 117 (b). The petitioners had no "customers." All of the sales of timber were to the Wier Long Leaf Lumber Co. pursuant to the contract of February 12, 1917. The petitioners had no "trade or business" as that term is commonly understood. Where the petitioners owned the standing timber for a period of more than one year at date of sale the sales were of capital assets within the meaning of section 117 (a) and the petitioners are taxable accordingly.

Consonant with our ruling upon this point the parties have stipulated that the losses deductible from the gross incomes for 1936 are $277.61 and $163.74, respectively, instead of the amounts allowed by the respondent in the determination of the deficiencies for 1936, namely, $1,693.08 and $1,516.75, respectively. This stipulation will be given effect in the Rule 50 recomputation of deficiencies for 1936.

### Issues II and III.

#### The Carroll Lease.

Findings of Fact.—On December 12, 1930, the decedent, W. H. Stark, acquired by assignment a lessee's interest in certain improved real estate located in the business district of Beaumont, Texas. The assignment of the lease was in consideration of decedent's payment of certain promissory notes of the assignor in the total amount of $102,500 which decedent had endorsed as a surety. The lease which

the decedent so acquired, sometimes hereinafter referred to as the "Carroll lease", was executed in 1923 and ran for a term of 99 years at an accelerated rental ranging from $150 per month in the early years to $600 per month from January 1, 1929, to the end of the lease term, June 1, 2022.

There was a two-story brick building on the premises when decedent took possession which had been erected by the prior lessee in compliance with a condition of the lease agreement. This building was subleased for store space and other purposes.

After decedent's acquisition of the lease the property lost some of its desirability for rental purposes, due to a shift in the direction of the development of the city's business area, so that the operation of the lease resulted in a loss to the decedent each year up to the time of his death.

In determining the estate tax liability of the decedents, the respondent treated the lease as a liability of the estates rather than as an asset, estimating that in the operation of the lease over its remaining life of 85 years the total amount of the excess of expenses over income reduced to present worth, would be $85,000. Accordingly, the respondent permitted a deduction in the estate tax return of each of the decedents of one-half of that amount, or $42,500.

During 1937 and 1938 the expenses of operating the lease, including the rental payments to the lessor exceeded the income therefrom by the amounts of $7,683.41 in 1937 and $10,696.67 in 1938. In their income tax returns for those years the petitioners each claimed as a loss deduction from gross income one-half of those amounts. The deductions so claimed were disallowed by the respondent, along with several other items, with the comment in the deficiency notice that such items "do not constitute proper deductions from gross income."

A detail of the 1937 loss of $7,683.41 is as follows:

| | |
|---|---:|
| Total paid to the executor of the original lessor's estate | $31,316.79 |
| Court costs paid | 118.10 |
| City of Beaumont taxes paid | 6,937.55 |
| Jefferson County taxes paid | 1,654.55 |
| Cost of water and repairs | 78.67 |
| Cost of insurance | 332.00 |
| Rent paid | 2,400.00 |
| Total paid in 1937 | 42,837.66 |
| Less: Rents received | 3,138.38 |
| Difference | 39,699.28 |
| Less: Amount accrued on estate tax returns | 32,015.87 |
| Difference | 7,683.41 |

Respondent recognized said $7,683.41 item as "Carroll lease loss in 1937" and recognized that if allowable it would be deductible one-half by each estate, but nevertheless he disallowed it. Respondent's explanation therefor was that the item does not constitute a "proper" deduction from gross income.

A detail of the 1938 claimed loss is as follows:

| | |
|---|---:|
| Rent paid to the executor of the original lessor's estate | $7,200.00 |
| City of Beaumont taxes paid | 3,593.81 |
| Jefferson County taxes paid | 1,364.76 |
| Cost of water and repairs | 86.88 |
| Other cash payments | 510.16 |
| Total paid in 1938 | 12,755.61 |
| Less: Rents received | 2,058.94 |
| Excess of payments over rentals | 10,696.67 |

In his deficiency notice respondent referred to the $10,696.67 as "Carroll lease expense in 1938" and recognized that if allowable it would be deductible one-half by each estate, but he disallowed it with the explanation that the item did not constitute a "proper" deduction from gross income.

OPINION.—The petitioners contend, first, that their net losses from the operation of the Carroll lease in 1937 and 1938 are deductible in full in their income tax returns for those years, notwithstanding that an allowance was made in the estate tax returns on account of such estimated losses. They further contend, in the alternative, that in any event they are entitled to the deduction of the portion of such losses remaining after allowance for amortization of the $85,000 taken as deductions in the estate tax returns, at the rate of $1,000 a year for the remaining 85 years of the life of the lease.

Section 162 of the Revenue Acts of 1936 and 1938, relating to income tax imposed on estates and trusts, provides that "The net income of the estate or trust shall be computed in the same manner and on the same basis as in the case of an individual", with exceptions not here material. Section 23 of the same acts provides for the deduction from gross income of:

* * * All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, * * * and rentals or other payments required to be made as a condition to the continued use or possession, for purposes of the trade or business, of property to which the taxpayer has not taken or is not taking title or in which he has no equity. [Subdivision (a).]

\*        \*        \*        \*        \*        \*        \*

* * * Taxes paid or accrued within the taxable year [with exceptions not here material.] [Subdivision (c).]

\*        \*        \*        \*        \*        \*        \*

\* \* \* In the case of an individual, losses sustained during the taxable year and not compensated for by insurance or otherwise—

(1) if incurred in trade or business; or

(2) if incurred in any transaction entered into for profit, though not connected with the trade or business; \* \* \* [Subdivision (e).]

We do not think it material that the excess of the amounts paid in respect of the Carroll property over the income therefrom was claimed by petitioners in their returns as deductions under subdivision (e). If the amounts are proper deductions from gross income under any subdivision of section 23 they must be allowed, regardless of any claim made by the petitioners. See *Seufert Brothers Co.* v. *Lucas*, 44 Fed. (2d) 528.

We have no doubt that the petitioners are entitled to deduct the total amount of the city of Beaumont taxes and Jefferson County taxes paid within each taxable year, regardless of whether the petitioners are in a trade or business. The taxes paid in each year were in excess of the rentals received from the Carroll property. We further have no doubt that the rentals paid upon the Carroll property are a legal deduction from the gross income of the estates in the process of administration or settlement, regardless of the amount of the rents received from the property. The same is true with regard to the other expenses paid in connection with the Carroll property during the taxable year. Although the petitioners disclaim that they were carrying on any trade or business, they were clearly required to include in their gross income the rentals received from the Carroll property. We think that they were entitled to deduct from gross income the expenses connected with the operation of that property as business expenses.

The only objection which the respondent offers to the allowance of the deductions claimed in the income tax returns of the estates for the years in question is that an allowance of $85,000 was made in the estate tax returns of the decedents in respect of such contemplated losses. We do not think that this objection is well founded. The estate tax return is concerned only with the value of the net estate which is transferred by the death of the decedent. It is not material in these proceedings that the respondent determined that the value of the net estate of each decedent was $42,500 less than otherwise would be the case by reason of the inclusion in the gross estate of an unprofitable lease.

The only question with which we are concerned here is whether the amounts of the payments made by the estates during the years 1937 and 1938 in respect of the Carroll property are legal deductions from gross income. That question must be determined from the provisions of law relating to the computation of the incomes of such estates. See *Adams* v. *Commissioner* (C. A. A., 8th Cir.),

110 Fed. (2d) 578; *Robert J. Kleberg et al., Executors*, 31 B. T. A. 95; *Cecil B. Highland, Executor*, 43 B. T. A. 598. In *Adams* v. *Commissioner, supra*, the court said:

4. Double Deduction.—Some emphasis is placed, both by the Board and the Commissioner, on the fact that some or all of the deductions claimed here were claimed also in connection with returns for *income* taxation of the estate. There is no necessary inconsistency in claiming the deductions as to both estate taxes and also as to income taxes of the estate. The two taxes are different in theory and incidence. It is for the Congress to prescribe what, if any, deductions are to be allowed as to each. Also, it is for the Congress to declare that there shall be but one deduction and where that shall be permitted. Congress has prescribed separately the deductions allowable for estate tax purposes and for income tax purposes. Congress has not declared that these deductions shall, in any way, be affected by the circumstances—often of occurrence—that the same items might come within each of the separate deduction provisions. It is not for the Courts to supply this omission—if it be such—in the statute. See *Brown* v. *Commissioner*, 74 F. 2d 281, 286, C.C.A. 10.

On the record in these proceedings we hold that the petitioners are entitled to deduct the amount of the payments made by the estates in respect of the Carroll property during the years 1937 and 1938 over the rents received therefrom, as contended by the petitioners.

It is unnecessary, in view of our ruling on the principal question, to discuss the petitioners' alternative contention that they are entitled in any event to the deduction of the amounts of the net losses reduced by a proper amortization allowance on account of the deductions taken in the estate tax returns.

## Issue IV.

### Attorney's Fee.

Findings of Fact.—Prior to the death of the decedent, W. H. Stark, litigation arose in the District Court of Jefferson County, Texas, between him and the estate of his deceased lessor under the Carroll lease to determine whether W. H. Stark was liable as assignee of the lease for certain obligations of the original lessee, W. H. Stark contending that he was not so liable, since he had not expressly assumed the obligations of the original lessee. In an opinion handed down on May 9, 1935, the court held that W. H. Stark was personally liable for the performance of each and all of the original lessee's obligations fixed by the terms of the Carroll lease. He appealed to the Court of Civil Appeals sitting at Beaumont, Texas, where the judgment of the District Court was affirmed on December 5, 1936, approximately two months after Stark's death. The decision of the appellate court was that, when he purchased, received, and accepted the assigned lease from H. M. Hargrove & Co. and took possession of the leased premises, W. H. Stark then

became liable for and obligated to pay to Carroll, his successors, and assigns, all rents thereafter falling due under the lease, and to perform all of the obligations imposed upon the lessee therein. Thereafter, and after the death of the decedents the executor of their estates filed in the Supreme Court of Texas an application for a writ of error, which was denied. The executor then engaged another attorney to present to the Supreme Court of Texas a motion for a rehearing on the application for a writ of certiorari. This motion was likewise denied. For such services the executor paid the attorney in 1937 a fee of $2,500 and also paid the cost of printing briefs in the amount of $145.20. These expenditures were claimed as expense deductions in petitioners' income tax returns for 1937, one-half of the total amount being claimed in the return of each petitioner. The claimed deductions were disallowed by the respondent in the determination of the deficiencies.

OPINION.—The question on this issue is whether the petitioners are entitled to deduct the attorney's fee and cost of printed briefs which the executor paid in connection with the litigation to determine the petitioners' obligations under the Carroll lease.

In their briefs the petitioners claim that the amount in question is deductible not as a business expense but as a loss under section 23 (e) (2) of the Revenue Act of 1936. They state:

We do contend (a) that the Carroll lease acquisition was a transaction entered into by the decedents for profit, (b) that the payment of these items by petitioners represented a *loss* sustained, since the expenditures were made in vain, and (c) such loss was *not* sustained in connection with a "trade or business."

In *Kornhauser* v. *United States*, 276 U. S. 145, the question before the Court was whether a practicing attorney could deduct from his gross income of 1918, $10,000 which he paid during that year in defense of a suit brought against him by a former partner in respect of legal fees. The deduction was claimed either as an ordinary and necessary expense of carrying on a trade or business, or as a loss. The Supreme Court dismissed the taxpayer's claim that it was a loss with a single statement: "We think it is obvious that the expenditure is not a loss." We think that the petitioners stand upon no better ground in claiming the deduction of $2,645.24 as losses than did the taxpayer in *Kornhauser* v. *United States, supra.*

It remains to be considered whether the amount may be deducted under any other provision of section 23 of the Revenue Act of 1936.

It is plain that the expenditures here in question had nothing whatever to do with the receipt of income by the estates during the years 1937 and 1938. The litigation in respect of which the amounts were paid had started long before the deaths of either of the decedents. The executor saw fit to continue the litigation.

894

The petitioners in support of their contention cite *Cecil B. Highland, Executor, supra,* now on appeal before the United States Circuit Court of Appeals for the Fourth Circuit. In that case we held that expenses arising out of actions brought by an executor to maintain control or management of an estate as a going concern were legal deductions from gross income, but that those incurred in mere passive conservation of assets were not. In our opinion the expenditures here in question fall in the latter category.

We are of the opinion that the respondent did not err in disallowing the claimed deductions.

Reviewed by the Board.

*Decisions will be entered under Rule 50.*

STERNHAGEN dissents.