JOE S. RAY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 69322. Filed September 23, 1959.

*W. T. Rogers, Esq.*, for the petitioner.
*Robert O. Rogers, Esq.*, for the respondent.

FISHER, *Judge:* This proceeding involves a deficiency in income tax determined against petitioner for the taxable year 1952 in the amount of $15,564.46.

The principal issue presented is whether petitioner is entitled to treat, as long-term capital gain pursuant to sections 117(k)(2) or 117(j) of the Code of 1939,[1] the amount of $40,000 which he received

---

[1] All statutory references are to the Code of 1939 unless otherwise specified.

as an advance payment during the taxable year 1952 for timber to be cut from his or other land and delivered to the purchaser.

### FINDINGS OF FACT.

Some of the facts are stipulated and, as stipulated, are incorporated herein by this reference.

Joe S. Ray, hereinafter called petitioner, is an individual with his place of residence at West Green, Georgia. He filed his individual Federal income tax return for the taxable year 1952 with the director of internal revenue, Atlanta, Georgia.

Petitioner kept his books and records and filed his return for the year 1952 on the cash basis.

For many years prior to and including the taxable year 1952, petitioner was engaged in the business of farming on his lands in the town of West Green, Georgia, including turpentining the pine trees growing thereon. Turpentining continues for about 8 or 10 years, which is about the average life of a pine tree. When all the turpentine was extracted or "worked out," petitioner would cut the tree for pulpwood or sawmill timber and let another one grow. During the years petitioner was engaged in turpentining, he sold many trees which had been worked out of turpentine.

During the year 1951, petitioner had a fire on his tree farm, and in order to salvage the trees as much as he could, he sold pulpwood to dealers. Petitioner sold said pulpwood until about January 1952.

On March 15, 1952, petitioner entered into a contract (designated as indenture) with the Mengel Company, hereinafter referred to as Mengel. Later on this same date, petitioner and Mengel entered into a supplemental agreement to add to the terms of the original contract. The original contract, as supplemented, is sometimes hereinafter referred to as the contract.

Said contract wherein petitioner is referred to as "grantor" and Mengel as "grantee," commences with the recital:

That for and in consideration of the sum of Forty Thousand ($40,000) Dollars, * * * Grantor has granted, bargained, sold and conveyed, and by these presents does grant, bargain sell and convey unto Grantee * * *:

All of the pine trees * * * upon the following described lands * * *

There then follows the legal description of the various lands located in Coffee County, Georgia, containing approximately 4,800 acres.

The contract provides, *inter alia*, as follows:

1. The basic premises of this indenture is that forty thousand (40,000) standard cords * * * of pulpwood will be produced from the said timber and trees * * *

2. Grantee, its successors and assigns, shall have the right to enter upon said lands and to cut and remove the trees and timber hereby conveyed * * *.

The cutting shall be in accordance with the cutting schedule stated hereinafter and the other terms and conditions of this indenture.

3. The payment of $40,000 made by Grantee to Grantor at the ensealing and delivery of this indenture is an advance payment at the rate of one ($1.00) Dollar per standard cord on the stumpage price to be paid by Grantee to Grantor for the pulpwood to be cut from the timber and trees on said lands. As the cutting and removal progresses, the balance of the stumpage price, to be determined as hereinafter stated, shall be paid by Grantee to Grantor.

4. Grantor and Grantee acknowledge that the purchase price of pine pulpwood in Coffee County, Georgia, varies from time to time, and that it is the accepted custom in the trade for the stumpage price paid to the owner of the timber to vary in proportion. It is agreed between the parties hereto that the stumpage price which shall be paid by Grantee to Grantor shall so vary, * * * bearing in mind at all times that Grantee shall receive credit on the stumpage price in the sum of $1.00 per standard cord already paid thereon by the advance payment made at the ensealing and delivery of this indenture. * * *

5. As a cutting schedule for cutting and removing said timber and trees, 5,000 standard cords per year, at the rate of not less than 1,000 and not more than 2,000 standard cords in any quarter part of a year, shall be cut and removed from said land after cutting and removal operations shall have commenced normally.

6. Grantee shall keep accurate records of all timber and trees cut and removed from said land, shall furnish said information to Grantor at regular weekly intervals, and shall account to and pay Grantor at regular weekly intervals the balance due him for stumpage for all timber and trees cut and removed from said land.

7. Grantor shall make proper returns for all taxes due and to become due on said lands, timber and trees, and shall pay all taxes thereon as the same shall become due.

8. Part of the consideration for this indenture is the covenant of Grantor that he will, with initiative and all reasonable diligence and care, safeguard and protect the timber and trees on said land against loss by theft, fire and all forms of waste. * * *

9. If for any reason the timber and trees on said land and covered by this indenture shall fail to produce the 40,000 standard cords of pulpwood provided for herein, then Grantee, its successors and assigns, shall have the right and privilege of retaining a sufficient sum, out of the balance due for stumpage, to retire any unearned part of the $40,000 advanced at the ensealing and delivery of this indenture for the contemplated production of 40,000 standard cords.

10. Grantor is presently engaged in turpentining and other woodland operations on said lands, and it is the agreement of the parties that said operation may continue, consistent with the terms of this indenture. *Also, it is the present agreement of the parties hereto that Grantor, within the cutting schedule hereinabove mentioned, will cut and remove said timber and trees for pulpwood purposes, and that from him as a producer of pine pulpwood Grantee will purchase same and pay the then prevailing producer's price, thereby enabling Grantor possibly to realize a greater return than he would receive from the stumpage alone.* If Grantor should so cut and remove said pulpwood he shall have the right to do so * * *. As such producer of pine pulpwood, Grantor shall be paid by Grantee the generally prevailing price then being paid to producers in Coffee County, Georgia, for each standard cord of acceptable pine pulpwood, less, however, at all times a deduction of $1.00 per standard cord by reason of the advance payment already made by Grantee to Grantor at the ensealing and delivery of this indenture. * * *

11. *Grantor owns, has access to or may acquire other lands than those particularly described hereinbefore having thereon pine timber suitable for pulpwood purposes, and he may wish to cut pulpwood therefrom and as a producer ship same to Grantee instead of cutting off and over the lands particularly described in this indenture. * * * Grantee herein agrees to such substitution.* Each standard cord of acceptable pulpwood so shipped shall reduce pro tanto the 40,000 standard cords to be cut off the lands particularly described hereinbefore in this indenture.

12. If, and not before, Grantor shall default in cutting, removing and shipping pulpwood to or at the direction of Grantee in accordance with the cutting rate and schedule as provided or as permitted by this indenture, then and in that event Grantee may commence operations hereunder so as to assure continuance of said production schedule. * * *

13. Upon Grantee's receiving and accepting 40,000 standard cords of pulpwood under the terms of this indenture, or on March 14, 1962, whichever shall occur first, this indenture shall terminate, and on said termination all timber and trees remaining on said particularly described land shall revert to and become the property of Grantor.

14. All rights and privileges under this indenture shall be assignable by either Grantor or Grantee, * * * [Emphasis supplied.]

The supplemental agreement provides, *inter alia*, as follows:

1. * * * *Said previous agreement contemplates that first party will cut and remove said timber and trees for pulpwood, load same f.o.b. freight cars, and ship as may be directed by second party.* In such event it is provided that first party shall be paid, as therein set forth, on a per standard cord basis, as a producer of pine pulpwood.

2. In supplement to said agreement it is hereby made the further agreement of the parties that for every standard cord * * * produced by first party and loaded f.o.b. freight cars at a convenient railroad loading point in Coffee County, Georgia, destined to or as directed by second party, its successors or assigns, second party shall pay to first party over and above and in addition to the sum provided for in said main agreement to first party as a producer, the sum prevailing at the time of cutting and loading, and being paid as a commission to dealers in pine pulpwood in Coffee County and adjoining counties. * * *

*     *     *     *     *     *     *

4. All of the agreements and understandings of the parties have been reduced to writing and there are no agreements nor understandings between the parties, written or verbal, except as incorporated in said main agreement and this supplement thereto. Except as supplemented hereby said main agreement shall remain of full force and effect and unchanged. [Emphasis supplied.]

Petitioner selected and arranged for his two sons to cut the trees from his lands called for under the Mengel contract. His sons were "forest farmers," a broad term denoting the business of row cropping, timber, and custom farming. They were partners doing business under the name of Ray Naval Stores. They began the work of cutting the timber covered by the Mengel contract in January 1954.

Petitioner, who was unable to do physical work during the period involved herein, never personally cut any of the pulpwood called for under the Mengel contract. He selected and arranged for his sons to do the cutting to protect his interests because he thought they would

take care of the timber, use good forest practices, and not "butcher it up."

Both the land and timber described and specified in the Mengel contract were owned by petitioner for a period of more than 6 months prior to March 15, 1952, the date of said agreement.

During the year 1952, pursuant to the terms of the contract and the supplemental agreement thereto, Mengel paid to petitioner the amount of $40,000 as an advance payment which he deposited in his personal bank account. There were no restrictions placed on his use of said payment, and no part of it was pledged to the development or operation of the timber properties. No part of said amount was included by petitioner as gross income in his individual Federal income tax return for the taxable year 1952.

Respondent, in his statutory notice, determined that said amount was gross income to petitioner for the taxable year 1952 and increased petitioner's taxable net income accordingly. At the trial, petitioner conceded that the amount of $40,000 was properly reportable for the year 1952, but claimed it should be treated as long-term capital gains.

OPINION.

Petitioner contends that the advance payment in the amount of $40,000 which he received during the taxable year 1952 from Mengel for timber to be cut under their contract qualifies for the preferential tax treatment accorded such gains pursuant to the provisions of section 117 (k) (2) or 117 (j) of the Code of 1939, as amended.[2] Respondent, on the other hand, urges that since petitioner did not surrender, but

---

[2] SEC. 117. CAPITAL GAINS AND LOSSES.

(a) DEFINITIONS.—As used in this chapter—

\* \* \* \* \* \* \*

(j) GAINS AND LOSSES FROM INVOLUNTARY CONVERSION AND FROM THE SALE OR EXCHANGE OF CERTAIN PROPERTY USED IN THE TRADE OR BUSINESS.—

(1) DEFINITION OF PROPERTY USED IN THE TRADE OR BUSINESS.—For the purposes of this subsection, the term "property used in the trade or business" means property used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 23(l), held for more than 6 months, and real property used in the trade or business, held for more than 6 months, which is not (A) property of a kind which would properly be includible in the inventory of the taxpayer if on hand at the close of the taxable year, or (B) property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business, or (C) a copyright, a literary, musical, or artistic composition, or similar property, held by a taxpayer described in subsection (a)(1)(C). Such term also includes timber or coal with respect to which subsection (k) (1) or (2) is applicable and unharvested crops to which paragraph (3) is applicable. Such term also includes livestock, regardless of age, held for draft, breeding, or dairy purposes, and held by him for 12 months or more from the date of acquisition. Such term does not include poultry.

(2) GENERAL RULE.—If, during the taxable year, the recognized gains upon sales or exchanges of property used in the trade or business, plus the recognized gains from the compulsory or involuntary conversion (as a result of destruction in whole or in part, theft or seizure, or an exercise of the power of requisition or condemnation or the threat or imminence thereof), of property used in the trade or business and capital assets held for more than 6 months into other property or money, exceed the recognized losses from such sales, exchanges, and conversions, such gains and losses shall be considered as gains and losses from sales or exchanges of capital assets held for more than 6 months. If such gains do not exceed such losses, such gains and losses shall

specifically retained the cutting rights to the timber in question, he did not make a "disposal" of his timber as required under section 117(k)(2), *supra*. With respect to the applicability of section 117 (j), *supra*, respondent argues further that the payment involved was derived from the (future) severance and sale of the product of the real property, timber, and not from the conversion of the real property as upon a sale within the intendment of section 117(j); and, therefore, the proceeds are taxable as ordinary income, subject to depletion, and not long-term capital gains from the sale of real estate used in petitioner's trade or business. In the same vein, respondent avers further that petitioner sold severed timber, personalty, and not standing timber or realty, and hence did not make a sale of real property used in his trade or business. For reasons hereinafter stated, we agree with respondent.

At the outset, it is essential to ascertain the meaning of section 117(k)(2), insofar as it is pertinent to the instant case, in order to determine the type of transaction which will qualify for the special tax benefits provided thereby. Section 117(k)(2), which is a relief provision, provides generally that, in the case of the "disposal" of timber (held for more than 6 months prior to such disposal) by the owner thereof under a contract by virtue of which the owner retains

not be considered as gains and losses from sales or exchanges of capital assets. ❋ * *
    ＊        ＊        ＊        ❋        ＊        ＊        ＊
(k) GAIN OR LOSS IN THE CASE OF TIMBER OR COAL.—

(1) If the taxpayer so elects upon his return for a taxable year, the cutting of timber (for sale or for use in the taxpayer's trade or business) during such year by the taxpayer who owns, or has a contract right to cut, such timber (providing he has owned such timber or has held such contract right for a period of more than six months prior to the beginning of such year) shall be considered as a sale or exchange of such timber cut during such year. In case such election has been made, gain or loss to the taxpayer shall be recognized in an amount equal to the difference between the adjusted basis for depletion of such timber in the hands of the taxpayer and the fair market value of such timber. Such fair market value shall be the fair market value as of the first day of the taxable year in which such timber is cut, and shall thereafter be considered as the cost of such cut timber to the taxpayer for all purposes for which such cost is a necessary factor. If a taxpayer makes an election under this paragraph such election shall apply with respect to all timber which is owned by the taxpayer or which the taxpayer has a contract right to cut and shall be binding upon the taxpayer for the taxable year for which the election is made and for all subsequent years, unless the Commissioner, on showing of undue hardship, permits the taxpayer to revoke his election; such revocation, however, shall preclude any further elections under this paragraph except with the consent of the Commissioner.

(2) In the case of the disposal of timber or coal (including lignite), held for more than 6 months prior to such disposal, by the owner thereof under any form or type of contract by virtue of which the owner retains an economic interest in such timber or coal, the difference between the amount received for such timber or coal and the adjusted depletion basis thereof shall be considered as though it were a gain or loss, as the case may be, upon the sale of such timber or coal. Such owner shall not be entitled to the allowance for percentage depletion provided for in section 114(b)(4) with respect to such coal. This paragraph shall not apply to income realized by the owner as a co-adventurer, partner, or principal in the mining of such coal. The date of disposal of such coal shall be deemed to be the date such coal is mined. In determining the gross income, the adjusted gross income, or the net income of the lessee, the deductions allowable with respect to rents and royalties shall be determined without regard to the provisions of this paragraph. * * *

an "economic interest" in such timber, the transaction will be treated as though it were a sale of the timber.

Analysis of the legislative history and the language of subsection (k) (1) and (2), indicates that Congress intended to limit the benefits of section 117(k)(2) to those transactions where the timber owner surrendered to another his cutting rights to the timber involved, retaining an economic interest usually in the nature of a lease or royalty interest.[3] The most common instance of such disposal of timber with an economic interest retained is where it is sold on the stump by the thousand board feet, being measured after cut, and the owner is paid an amount on a per unit cut basis. See *Boeing* v. *United States*, 98 F. Supp. 581 (Ct. Cl. 1951); *L. D. Wilson*, 26 T.C. 474. Where timber was sold in this manner, prior to the enactment of section 117(k) (added by section 127(c) of the Revenue Act of 1943), the transaction was viewed by the Commissioner as a lease or cutting contract, not as an outright sale of the timber, and receipts of the timber owner were generally taxed as ordinary income. G.C.M. 22730, 1941-1 C.B. 214. See *Burnet* v. *Harmel*, 287 U.S. 103 (1932). This situation was remedied by section 117(k)(2), *supra*, which operates to make a qualifying transaction a sale of the timber, gain or loss from which may thereby become eligible under section 117(j) for capital gains treatment.

Respondent's contention that petitioner failed to make a "disposal" of his timber as required under section 117(k)(2) can best be understood, we believe, by a brief comparison of its companion subsection (k)(1), *supra*. Significantly, section 117(k)(1) refers to "the cutting of timber * * * by the taxpayer who owns, * * * such timber" whereas, section 117(k)(2) refers to "the disposal of the timber * * * by the owner thereof." These two sections are concerned with mutually exclusive transactions in timber, and the quoted language makes it clear that, for the purposes of section 117(k), an owner who cuts his timber is different from an owner who disposes. The tax benefits provided by section 117(k)(1) may differ materially from those arising under 117(k)(2). Moreover, in order to obtain the benefits of section 117(k)(1), a taxpayer must make an election upon his return

---

[3] The Senate Finance Committee which originally recommended the enactment of section 117(k)(2) of the Code stated, in part, in S. Rept. No. 627, 78th Cong., 1st Sess., pp. 25–26, as follows:

"Your committee is of the opinion that various timber owners are seriously handicapped under the Federal income and excess profits tax laws. The law discriminates against taxpayers who dispose of timber by cutting it as compared with those who sell timber outright. The income realized from the cutting of timber is now taxed as ordinary income at full income and excess profits tax rates and not at capital gain rates. In short, if the taxpayer cuts his own timber he loses the benefit of the capital gain rate which applies when he sells the same timber outright to another. Similarly, owners who sell their timber on a so-called cutting contract under which the owner retains an economic interest in the property are held to have leased their property and are therefore not accorded under present law capital-gains treatment of any increase in value realized over the depletion basis."

for the taxable year. This election is binding upon him for all future years unless the Commissioner, upon a showing of undue hardship, permits him to revoke his election. *Volney L. Pinkerton*, 28 T.C. 910 (1957). No such election is required to obtain the benefits of section 117(k)(2), the application of which is mandatory.

In the instant case, petitioner did not make an election to report the receipt of the $40,000 in 1952 under section 117(k)(1), nor does he now claim the application thereof. In this connection, it is apparent that if the term "disposal" is not construed to require a disposition of cutting rights, an owner of timber, who cuts his own timber, could avoid the election required by section 117(k)(1) and obtain what are usually the greater tax benefits of section 117(k)(2) by the use of the mere formality of contracting with a timber buyer to sell his timber to such buyer, as cut, at the then-prevailing price.

In the light of the foregoing, we believe it is clear that Congress intended to distinguish between timber owners who cut their timber and those who lease their timber property to another, together with a grant to the lessee of the right to cut. Examination of the cases dealing with the proper interpretation of the term "disposal" as used in section 117(k)(2) reveals that in all such cases the term was in some manner compared with a lease, a cutting contract, or some other transaction wherein the timber owner did not cut his own timber and retained only a royalty interest. See *Ah Pah Redwood Co.* v. *Commissioner*, 251 F. 2d 163 (C.A. 9, 1957), reversing 26 T.C. 1197 (1956) on another issue; *Boeing* v. *United States, supra; Springfield Plywood Corporation*, 15 T.C. 697 (1950); and *L. D. Wilson, supra.*

Both parties agree that petitioner retained an economic interest in the timber involved, as that phrase is used in section 117(k)(2); that is, Ray was to look to the severance and sale of the timber for his return of capital. Respondent urges (and petitioner does not appear to question) the view that the term "disposal" as used in said section and as applicable to the issue here presented contemplates the transfer of cutting rights by the timber owner to another. The only dispute, therefore, between the parties with respect to the applicability of section 117(k)(2) is the factual question of whether or not petitioner, in fact, under the provisions of the Mengel contract, transferred his cutting rights to the timber involved herein to Mengel.

Respondent's determination that Ray is not entitled to the benefits of section 117(k)(2), is, of course, presumptively correct, and the burden of proof is upon petitioner to show error. Apart from petitioner's vague testimony, he presented no affirmative evidence (unless the contract with Mengel is to be so construed) to support his contention that he had transferred the cutting rights of the timber involved to Mengel or to its assignee, Union Bag and Paper Co., and

that said timber was subsequently cut by "independent pulpwood producers" hired by the purchaser.

To the contrary, the terms of the contract taken as a whole, and the testimony of petitioner and of his son, convince us that petitioner, in fact, retained the primary cutting rights and arranged for the cutting to be done by his sons under his control. True, under paragraph 2 of the contract, Mengel or its assignee, was to have the right to enter upon Ray's lands and to cut and remove the trees and timber conveyed by the contract. However, subsequent paragraphs 10 and 12 state that Ray "will cut and remove said timber and trees for pulpwood purposes, and that from him as a producer of pine pulpwood, Grantee [Mengel] will purchase same and pay the then prevailing producer's price." Only in the event that petitioner "shall default in cutting, removing, and shipping pulpwood" to or at the direction of Mengel, could Mengel commence cutting operations.

By a "Supplemental Indenture" executed on the same date, March 15, 1952, the parties clarified and reiterated their agreement which states, in part, that:

1. That said previous agreement contemplates that *first party* [Ray] *will cut and remove* said timber and trees for pulpwood, load same f.o.b. freight cars, and ship as may be directed by second party [Mengel or assignee]. In such event it is provided that first party shall be paid, as therein set forth, on a per standard cord basis, as a producer of pine pulpwood.

*      *      *      *      *      *      *

4. All of the agreements and understandings of the parties have been reduced to writing *and there are no agreements nor understandings between the parties, written or verbal, except as incorporated in said main agreement and this supplement thereto.* Except as supplemented hereby said main agreement shall remain of full force and effect and unchanged. [Emphasis supplied.]

It is clear that the construction of the Mengel contract, set forth fully in our Findings of Fact, depends upon an analysis of the contract as a whole. See *Commissioner* v. *P. G. Lake, Inc.*, 356 U.S. 260, 266 (1958). Despite the equivocal language used in some parts of the contract, it is evident from the entire contract that the parties intended that petitioner had the primary right and obligation to cut, remove, and ship the timber involved to the purchaser. The latter's right to perform the same functions arose only upon default by petitioner. Moreover, when questioned on cross-examination, petitioner made it clear that he fully understood that under the contract Mengel did not have any cutting rights unless petitioner failed to cut the timber himself or have it cut.[4] Although petitioner, on brief, con-

---

[4] On transcript pages 29 and 30, petitioner testified as follows:

"Q. Mr. Ray, when you entered into this contract with Mengel, did you intend for your sons at that time to take over the right to cut the property?

"A. That is what I held—that is the reason I asked for that stipulation.

"Q. You mean the stipulation that you could keep the cutting rights?

"A. Cutting under my control so I could turn it over to them.

"Q. And Mengel could come in only in the event you didn't?

"A. That I didn't do it or cause it to be done."

tends that he did not exercise the "option" to cut the timber himself, he not only presented no evidence of any default on his part, but made it clear that he arranged for his sons (doing business as Ray Naval Stores) to do the cutting for his own protection, in his own interest, and subject to his own control. Had they not cut in accordance with his requirements, he would have "run them out of there." The family relationship was significant to him. He picked his boys to do the work because they would realize that some day "this will be ours [the sons] and they'd take care of it." The cutting was in fact carried on by the sons and was begun in January 1954.

In support of his view that he is entitled to the tax benefits of section 117 (k) (2), petitioner cites, *inter alia*, *Boeing* v. *United States*, *Springfield Plywood Corporation*, and *L. D. Wilson*, all *supra*. These cases are distinguishable on their facts and issues and are not controlling herein. In *Boeing*, *supra*, the taxpayer-owner of the timber entered into a contract with the vendee whereby the latter agreed to cut and remove the timber from the vendor's lands, sell it at the current market price, and remit one-third of the gross profits to the owner. The vendee was to cut a minimum each year and pay for merchantable timber remaining when the time for performance was ended. Similarly, in *Springfield Plywood Corporation*, *supra*, the taxpayer acquired timberlands and within 6 months thereafter entered into a contract for the disposal of all timber within certain categories to two parties, to be paid for as cut by the vendees over a 2-year period, and the vendees were required to pay for it at the end of that time whether cut or not. In *L. D. Wilson*, a partnership acquired a tract of timber and entered into a cutting arrangement with its controlled corporation, whereby the corporation cut and removed the timber and paid the partnership a specified price per thousand board feet cut and removed. The logging was done by an independent logger hired and paid by the corporation.

In the light of all of the foregoing, we hold that petitioner is not entitled to claim the benefit of section 117 (k) (2), *supra*.

In the alternative, petitioner contends that by virtue of the Mengel contract he made an outright sale of standing timber in certain designated tracts and since such timber was part of the real estate and not held for sale to customers in his trade or business of turpentining, he is entitled to capital gains treatment on the downpayment, $40,000, under section 117 (j), *supra*. Respondent urges that since petitioner made only an executory sale of severed timber, the payment represented proceeds to be derived from the severance of the product of real property, pulpwood, and not from the conversion of the real property itself as upon a sale under said statute. Essentially, it is respondent's position that by virtue of paragraphs 4 and 10 of the

Mengel contract, Ray's consideration for the pulpwood was wholly contingent on the severance and sale of the timber involved, thereby reserving to petitioner an "economic interest" in that timber, and that hence the proceeds of the production constitute ordinary income. See *Burton-Sutton Oil Co.* v. *Commissioner*, 328 U.S. 25 (1946).

It is well settled that (except where section 117(k)(2) is applicable) proceeds derived from the severance of natural resources by the holder of an economic interest in the property constitute ordinary income subject to depletion. *Palmer* v. *Bender*, 287 U.S. 551 (1932). In this connection, it is noteworthy that since the adoption of section 234(a)(9) of the Revenue Act of 1918, Congress has consistently included the allowance for depletion in the case of timber in the same Code section that includes the allowance for depletion in the case of oil, gas, and other minerals. Sec. 23(m), I.R.C. 1939. It is evident, therefore, that the definition of an economic interest in timber is substantially identical with the definition of that term in oil and gas and other minerals. We observe also that the regulations have applied the same definition. Sec. 39.23(m)–1(b), Regs. 118.[5]

In *Lincoln D. Godshall*, 13 T.C. 681 (1949), where the taxpayer claimed that in fact he made an absolute sale of his interests in certain ore-bearing properties, notwithstanding that his rights to payments were solely dependent on what his mine would produce, we said (p. 684):

Even in the case of a technical sale, consummated by passage of title, the seller is deemed to have "maintained a capital investment or economic interest" in the mineral property transferred if all or part of the price is payable out of the minerals produced or the net proceeds of production. * * *

\*     \*     \*     \*     \*     \*     \*

In determining tax incidence the essential test is thus whether or not petitioner held an economic interest in the minerals in place. If he did, the amounts paid him out of the proceeds of their production constitute ordinary taxable income, and he is entitled to a deduction for depletion.

We think it clear that the same rules are applicable to timber properties.

Applying the aforesaid rationale to the facts of record, it is clear that Ray held an economic interest in the timber involved as that term has been construed for tax purposes. That petitioner received a part of said payment prior to actually earning it by severance and sale does not alter its tax character as ordinary income. See *Renwick* v. *United States*, 87 F. 2d 123 (C.A. 7, 1937). Assuming that, by virtue of the contract, there was a transfer of some right to the timber to Mengel, we do not believe that there was any conversion

---

[5] "An economic interest is possessed in every case in which the taxpayer has acquired, by investment, any interest in mineral in place or standing timber and secures, by any form of legal relationship, income derived from the severance and sale of the mineral or timber, to which he must look for a return of his capital. * * *"

of a capital investment within the intendment of section 117(j), *supra.* In our view the advance payment of $40,000 appears essentially to be a substitute for what would otherwise be received by Ray at a future time as ordinary income. All that petitioner was doing in accepting the $40,000 was converting future income into present income. *Commissioner* v. *P. G. Lake, Inc.*, 356 U.S. 260 (1958).

Petitioner contends that the "granting clause" in the contract does not denote a lease or an executory contract to sell, as respondent urges, but is a definite expression of an outright sale. Ray argues that he sold the timber on a deferred payment plan, a portion of the total consideration having been received as a "downpayment" at the time of the conveyance in 1952, and the balance payable as the timber is cut by the purchaser. The facts do not support petitioner's view. Specifically, we note that paragraph 3 of the contract refers to the $40,000 as an "advance payment" for pulpwood to be cut, removed, and delivered, rather than a downpayment on standing timber. It is apparent that petitioner does not take a definitive position with respect to the proper interpretation to be accorded said contract. Depending on the particular argument he advances, he characterizes the transaction with Mengel either as a sale of stumpage to be cut by Mengel with the retention of an economic interest or as an absolute sale of timber on a deferred payment plan.

Viewing the contract as a whole, we do not believe that Ray intended to make an outright sale of the timber referred to in said agreement. As noted hereinabove, under the Mengel contract, petitioner had the privilege of substituting the pulpwood called for under the contract from "other lands" than those specifically set forth in the agreement. Such terms are not compatible with a sale of petitioner's timber on the tracts covered by the contract. We believe that Ray's modus operandi is more characteristic of a timber dealer than an owner of a timber tract selling off some or all of the timber used in his trade or business of turpentining.

In the instant case, it appears to us that the contract was plainly executory in nature and that it was the intention of the parties that title to the timber was to remain in petitioner until cut. Primarily, the contract provided for the cutting to be done by petitioner. The risk of theft, fire, and all forms of waste remained with petitioner, who was likewise required to pay all taxes on the timber. The contract itself evidently did not contemplate a completed sale of the entire stand of timber. Sale took place only when and to the extent the timber was cut and paid for. See *Carrie Lutcher Brown*, 26 B.T.A. 781 (1932), affd. 69 F. 2d 863 (C.A. 5, 1934), certiorari denied 293 U.S. 579; *Florence A. Foster*, 18 B.T.A. 819 (1930), reversed on another issue 57 F. 2d 516 (C.A. 5, 1932).

In support of his position, petitioner relies, *inter alia*, upon *Estate of M. M. Stark*, 45 B.T.A. 882 (1941), and *John W. Blodgett*, 13 B.T.A. 1388 (1928), which are clearly distinguishable on their facts from the case at bar. In *Estate of M. M. Stark*, *supra*, the issue was whether the taxpayer was selling timber held primarily for sale to customers in the ordinary course of business. The contract provided that the purchaser acquired the "exclusive right" to enter upon the vendors' timber tract, and to turpentine, cut, and remove all the standing pine timber of a certain diameter at the stump. The purchaser was to market a minimum amount each year and pay the sellers currently for the timber removed. In *Blodgett*, *supra*, the taxpayer-owner contracted to sell the standing timber which the purchasers themselves were to cut and market, and the purchasers were to pay the vendors each month a certain percentage of the selling price.

We think it clear, in the light of the foregoing discussion, that the transaction here in question was not a sale of real estate (here timber) within the meaning of section 117(j). Likewise, it seems apparent (and petitioner does not argue otherwise) that the timber was not property of petitioner used in his trade or business of a character which is subject to the allowance of depreciation within the meaning of section 117(j).

We hold that petitioner has failed to meet the burden of proving error in respondent's determination, and that the $40,000 in question is taxable as ordinary income for the year 1952.

*Decision will be entered under Rule 50.*